**UNITED STATES of America,**
**Appellee,**

v.

**Tommy CRUZ, Luis Rodriguez,**
**Defendants–Appellants,**

**Carlos Medina, Defendant.**

**No. 02–1458.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 21, 2003.

Decided April 2, 2004.

Jeremy G. Epstein, New York City (William Hauptman, Shearman & Sterling, New York City, of counsel), for Appellant Tommy Cruz.

Noah Perlman, Assistant United States Attorney, Eastern District of New York, Brooklyn, N.Y. (Roslynn R. Mauskopf, United States Attorney, Susan Corkery, Assistant United States Attorney, Eastern District of New York, Brooklyn, NY, of counsel), for Appellee.

Before: OAKES, MESKILL and B.D. PARKER, Circuit Judges.

MESKILL, Circuit Judge:

Defendant-appellant Tommy Cruz was convicted of possession with intent to distribute heroin following a jury trial in the United States District Court for the Eastern District of New York, Ross, *J.* Cruz now appeals from that judgment. He contends that he was wrongfully convicted on an aiding and abetting theory after the district court erroneously admitted the expert testimony of a Special Agent from the Drug Enforcement Administration (DEA). For the reasons that follow, we agree that the court erred. We also conclude that, even if we were to take into account the improperly admitted testimony, the government failed to introduce sufficient evidence such that a reasonable trier of fact could find Cruz guilty beyond a reasonable doubt. Accordingly, we reverse Cruz's conviction and remand the case to the district court with instructions to enter a judgment of acquittal.

## BACKGROUND

Several years ago, a team of DEA agents worked with a paid informant to investigate the activities of Carlos Medina. Eventually, Brian Fleming, the case agent assigned by the DEA to manage the operation, directed the informant, Enrique Ramos, to meet with Medina at a Boston Market in Queens, New York and to purchase approximately 900 grams of heroin from him. In accordance with these instructions, Ramos spoke with Medina and arranged to meet him at the restaurant on December 13, 2000, for the purpose of buying the heroin.

On the Friday before this narcotics transaction took place, defendant Cruz was approached by an intermediary who apparently asked Cruz if he would assault several Ecuadorian men in exchange for $200. When Cruz agreed to do so, the intermediary arranged for a follow-up meeting with him on December 12, 2000. Medina attended this subsequent meeting and discussed the planned assault with Cruz. After Cruz affirmed his agreement to assault the Ecuadorians, he was told that he needed to return for a third meeting on December 13, 2000. However, on arriving the following day, Cruz was informed that events were not proceeding according to plan. Cruz was told that he initially needed "to watch" Medina's "back" while Medina finalized a "deal." He also learned that the so-called "deal" would be taking place at the aforementioned Boston Market.

In the interim, Fleming had assigned a surveillance unit of DEA agents to observe the Market and the surrounding area in an effort to monitor the meeting between Medina and Ramos. These agents were on hand conducting their surveillance when Cruz and his co-defendant, Luis Rodriguez, arrived at the Market in a Lincoln Town Car. According to the agents, Cruz and Rodriguez suspiciously examined vehicles in the nearby area as they approached the restaurant as if they were engaged in "countersurveillance" against law enforcement scrutiny.

Cruz and Rodriguez eventually entered the Boston Market, ordered food at the counter, and took a seat towards the side of the restaurant. Subsequently, Medina also arrived at the Market and sat at a different table with Ramos, who had arrived earlier and had been waiting for him. Ramos and Medina discussed the narcotics transaction and agreed that Medina would sell Ramos the heroin "right there." Neither Cruz nor Rodriguez had any contact with either Medina or Ramos while they were in the restaurant.

After Medina and Ramos finalized their negotiations, Medina left the Boston Market. Not long thereafter, DEA agents noted that Cruz and Rodriguez also left the Market and drove off in the Lincoln Town Car. More than half an hour later, the agents observed the Town Car return to the Market. Medina stepped out of the vehicle's front-side passenger seat and waved towards Ramos. In response, Ramos walked over to the car, stepped inside, and sat down in the back. At that stage, he noticed that Cruz was sitting in the driver's seat. Medina eventually directed Ramos' attention towards a telephone box that had been placed in the back of the vehicle behind the driver's seat. When Ramos opened the box, he found heroin hidden inside a plastic bag within the box.

Once he saw the drugs, Ramos informed Medina that he would soon return with the money for the heroin. When he stepped out of the Lincoln Town Car, Ramos gave a pre-arranged signal to the DEA agents. The signal informed the agents that he had seen the heroin and that they should move in to effectuate arrests. After they received the signal, the DEA agents closed in on the car. They seized the heroin and arrested both Medina and Cruz.

In the wake of these arrests, the government filed an initial indictment on January 9, 2001, charging Cruz, Medina and Rodriguez with two counts: (1) conspiracy to distribute a substance containing heroin in an amount of one kilogram or more in violation of 21 U.S.C. §§ 841 and 846 as well as 18 U.S.C. § 3551 et seq., and (2) possession with intent to distribute a substance containing heroin in an amount of one kilogram or more in violation of 21 U.S.C. § 841, 18 U.S.C. § 2, and 18 U.S.C. § 3551 et seq. The government subsequently filed a superseding indictment that

charged only Cruz and Rodriguez with these counts and reduced the amount of heroin they allegedly possessed with the intent to distribute and conspired to possess with the intent to distribute from "one kilogram or more" to "100 grams or more."

During the course of a two-day jury trial held in July 2001, the government called, among other witnesses, DEA Special Agent Mark Tully to testify against Cruz. Tully was one of the agents that had been on hand to observe the events at the Boston Market on December 13, 2000, and had arrested Cruz. Although Tully testified about several different subjects, only one particular aspect of his testimony concerns us here.

After his arrest, Cruz made a number of statements to Tully. At Cruz's trial, Tully testified regarding the substance of these post-arrest statements. Cruz apparently told Tully that he had been at the Boston Market and in the Lincoln Town Car "to watch [Medina's] back while he did business." Cruz also told Fleming that he had not known that he had agreed to take part in a "drug deal." Rather, Cruz explained that he "knew it was some kind of a deal, but not a drug deal." Cruz subsequently reiterated to Tully that he had been asked "to watch [Medina's] back while he [did] a deal or [did] business." When Tully inquired regarding whether Cruz understood that the deal in question was a "drug deal," Cruz explained that he "knew it was a deal that was going on, but [he] didn't know what kind of deal." Cruz purportedly informed Tully that he was not certain whether he and Medina "were going to be picking up money or if [they] were going to be delivering drugs, [he] didn't know which one it was."

The prosecutor ultimately asked Tully to explain what he thought Cruz "meant when he said he was there to do a deal—to watch somebody's back while he did a

deal?" Cruz's counsel objected to that question and the court suggested that such information "could be elicited if [the prosecutor] develop[ed] [Tully's] expertise." This evidentiary ruling led the prosecutor to ask Tully several questions about his experience with narcotics investigations. Over the course of these inquiries, the prosecutor once again asked Tully what the agent thought Cruz meant when the defendant told Tully that "he was there to watch somebody do a deal." When defense counsel objected to that question, the district court itself asked Tully whether, in the agent's "experience," he had heard the phrase "[t]here to watch someone's back" and suggested that the prosecutor should further "develop" that line of testimony. The prosecutor took the court's suggestion to heart by asking Tully what the aforementioned phrase meant. According to the record, Tully responded by explaining as follows:

> In my experience, when narcotics transactions happen like this you have people, lookouts for you. There are people that are out there to watch your back, to make sure that either if law enforcement are in the area that they're there to try to detect them before you go about and do your business, or that the person that you're doing the deal with is not trying to set you up that they're trying to rob your drugs from you or rob your money from you. You have people out there as lookouts conducting countersurveillance to detect either someone else that is looking to rob you or law enforcement that are trying to arrest you.

The government eventually called several other witnesses and then rested its case. Thereafter, Cruz's defense counsel moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. He argued, *inter alia*, that

"[b]ased on the totality of the evidence, even in the light most favorable to the government, there was no evidence that . . . Cruz knew . . . that the drug deal was going to happen." When the court denied that motion, defense counsel did not call any witnesses to testify on Cruz's behalf. The jury subsequently acquitted Cruz of conspiring to distribute a substance containing heroin but found him guilty of possession with intent to distribute a substance containing heroin in an amount of 100 grams or more.

The district court sentenced Cruz to 110 months imprisonment to be followed by five years supervised release. A judgment of conviction to that effect was entered on July 31, 2002, and this timely appeal followed.

## DISCUSSION

### I. *Standard of Review*

■ On appeal, Cruz contends that the district court erroneously admitted Tully's expert testimony and that the error was not harmless. "We review the district court's decision to admit or exclude expert testimony for an abuse of discretion." *Fashion Boutique of Short Hills v. Fendi USA,* 314 F.3d 48, 59–60 (2d Cir.2002). A district court's determination with respect to the admission of expert testimony "is not an abuse of discretion unless it is 'manifestly erroneous.'" *Amorgianos v. National Railroad Passenger Corp.,* 303 F.3d 256, 265 (2d Cir.2002) (quoting *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1042 (2d Cir.1995)).

### II. *Expert Testimony Offered By Law Enforcement Officials*

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. The rule provides that

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

■ When parties seek to introduce expert testimony in accordance with Rule 702, a district court must serve as a gatekeeper. *Amorgianos,* 303 F.3d at 265. The Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In order to fulfill these gatekeeping functions, the district court must "analyz[e] whether [the] proffered expert testimony is relevant, i.e. whether it ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos,* 303 F.3d at 265 (internal citations and quotation marks omitted). The court must also evaluate "whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered." *Campbell v. Metro. Prop. and Cas. Ins. Co.,* 239 F.3d 179, 184 (2d Cir.2001) (internal citations and quotation marks omitted).

■ The principles pertaining to expert testimony apply with full force where law enforcement officials are called on to provide scientific, technical, or other specialized knowledge to the trier of fact. *See*

Fed.R.Evid. 702 advisory committee's note (2000 Amendments) (discussing the application of Rule 702 to a law enforcement official's expert testimony). As long as a law enforcement official's expert testimony complies with the standards that govern the admissibility of such evidence, it need not be excluded. *Cf. United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir.2003).[1]

■ Hence, "we have repeatedly upheld the use of expert testimony by government agents to describe the characteristics and operating methods of narcotics dealers." *United States v. Boissoneault*, 926 F.2d 230, 232 (2d Cir.1991). In this regard, "we have held that experienced narcotics agents may explain the use and meaning of codes and jargon developed by drug dealers to camouflage their activities." *Id.* Moreover, we have also determined that such agents could "offer their interpretations of any physical evidence that is properly before the jury." *Id.* at 233. Furthermore, although "[w]e have repeatedly expressed our discomfort with expert testimony in narcotics cases that not only describes the significance of certain conduct or physical evidence in general, but also draws conclusions as to the significance of that conduct or evidence in [a] particular case," we have nonetheless "permitted experts to make conclusory statements, based on their experience, that the defendant was involved in drug-related activity." *Id.*

With these considerations in mind, we must now determine whether the district court in this instance properly admitted a DEA agent's expert testimony in accordance with the aforementioned standards.

## III. *Tully's Expert Testimony*

■ This appeal implicates a relatively straightforward issue. According to Cruz, the district court erroneously allowed Tully to offer expert testimony regarding the meaning of a phrase that Cruz employed to explain his purportedly unwitting role in Medina's narcotics transaction. We agree.

Tully served as a member of the surveillance unit of DEA agents that monitored the Boston Market as well as the surrounding area on December 13, 2000. During the course of Cruz's trial, the government called on Tully to testify as a fact witness about what he had seen during that surveillance operation. Tully also testified regarding several statements that Cruz made to him after Tully arrested the defendant. According to Tully, Cruz explained that he had been present at the Boston Market and in the Lincoln Town Car "to watch" Medina's "back" while Medina "did business" and "[did] a deal."

After Tully testified to this effect, the prosecutor, at the suggestion of the district court, solicited Tully's expert testimony regarding the meaning of the phrase "to watch someone's back." Tully responded to the prosecutor's inquiries by equating individuals who "watch" someone's "back" with "lookouts" in "narcotics transactions." On appeal, Cruz contends, *inter alia*, that the district court erred by allowing Tully to provide such expert testimony because the meaning of the phrase "to watch someone's back" is neither "coded nor esoteric."

The government does not dispute that Tully's opinion in this regard constituted

---

1. At the same time, even where such testimony satisfies the applicable standards, the district court should not blindly admit the testimony without further consideration. The testimony may, under certain circumstances, raise issues that implicate concerns under rules of evidence other than Rule 702. *See, e.g., Dukagjini,* 326 F.3d at 54 (noting that testimony admissible under Rule 702 may nevertheless implicate issues under Rule 403).

expert testimony. However, the government attempts to minimize the scope of that testimony by suggesting that Tully merely explained "that narcotics traffickers typically bring additional people to a drug deal to work as lookouts." This characterization is a less than apt description of the expert testimony the government elicited from Tully. The DEA agent did not simply elaborate on the typical presence of lookouts at drug deals. Rather, as our earlier recitation of the facts demonstrates, Tully relied on his expert opinion to interpret the meaning of the phrase "to watch someone's back" after Cruz used those terms to describe his role at Medina's side on December 13, 2000; Tully employed his expertise to construe that phrase in a fashion that attributed such conduct specifically to a "lookout" in a drug deal.

As we mentioned earlier, it is well settled that the government may "elicit expert testimony from a properly qualified expert witness regarding the parlance of the narcotics trade and the meaning thereof." *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir.1987). We allow the government to do so because "we have recognized that drug dealers often camouflage their discussions and that expert testimony explaining the meaning of code words 'may assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Dukagjini*, 326 F.3d at 52 (quoting Fed.R.Evid. 702). Because drug dealers often try to "disguise the content of their discussions as legitimate subject matter, courts may allow witnesses to 'decipher' the codes drug dealers use and testify to the true meaning of the conversations." *United States v. Garcia*, 291 F.3d 127, 139 (2d Cir.2002).

Although the government may ordinarily call on law enforcement officials to decipher drug jargon, district courts, in their role as gatekeepers, must be ever vigilant against expert testimony that could stray from the scope of a witness' expertise. *See Dukagjini*, 326 F.3d at 54–55. "When an expert is no longer applying his extensive experience and a reliable methodology," his testimony "should be excluded." *See id.* at 54. Moreover, when an expert's testimony "strays from the scope of [his] expertise," the testimony may well implicate Rule 403 of the Federal Rules of Evidence, *see id.*, which provides in pertinent part that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." Fed.R.Evid. 403. Where an expert strays from the scope of his expertise, "some jurors will find it difficult to discern whether the witness is relying properly on his general experience and reliable methodology, or improperly on what he has learned of the case." *Dukagjini*, 326 F.3d at 54.

District courts must be especially vigilant in evaluating the admissibility of expert testimony where, as here, a law enforcement official is called on to testify as a fact witness but also functions as an expert for the government. *See id.* at 53. Although this type of "dual testimony is not objectionable in principle," *United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir.2000), the government confers on law enforcement officials in this position an "'aura of special reliability and trustworthiness surrounding expert testimony, which ought to caution its use.'" *Dukagjini*, 326 F.3d at 53 (quoting *United States v. Young*, 745 F.2d 733, 766 (2d Cir.1984) (Newman, J., concurring)). This aura poses a particular risk of prejudice "'because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial.'" *United States v.*

*Brown,* 776 F.2d 397, 401 n. 6 (2d Cir.1985) (quoting *Young,* 745 F.2d at 766 (Newman, J., concurring)).

Moreover, when a law enforcement official testifies as both a fact and an expert witness, the danger that his expert testimony will stray from "applying reliable methodology and convey to the jury ... [his] 'sweeping conclusions' about [a defendant's] activities" is particularly acute. *Dukagjini,* 326 F.3d at 54. As we explained in *Dukagjini,*

> any expert in a criminal trial has the potential to deviate from the scope of his expertise. However, these difficulties are more likely to be encountered when the expert is ... a fact witness because such witnesses are introduced to the case primarily through an investigative lens, rather than a methodological lens. [Law enforcement officials] who are called to testify about both their expert opinions and the facts of the case may easily elide these two aspects of their testimony. Given their role, their perspective, and their focus on the facts, these [law enforcement officials] are more likely to stray from the scope of their expertise and to testify about other aspects of the case.

*Id.* at 55–56.

The heightened risk that a law enforcement official will stray from the scope of his expertise if he also functions as a fact witness is particularly troubling because expert testimony provided under these circumstances is especially likely to raise concerns about juror confusion under Rule 403. When a law enforcement official testifies about the facts of a case *and* offers expert opinions, "a juror understandably will find it difficult to navigate the tangled thicket of expert and factual testimony from the single witness, thus impairing the juror's ability to evaluate credibility." *Id.* at 54.

Although our comments in *Dukagjini* focused, by and large, on the pitfalls associated with the expert testimony of a *case* agent who also served as a fact witness, *see id.* at 53, those inherent dangers are also ordinarily implicated where any law enforcement official provides the same type of dual testimony. Indeed, in *Dukagjini,* we indicated that those risks were not limited to a case agent's expert testimony when we expressed concern about the potential problems that may follow when the government elicits dual testimony from either a case agent *or* any "fact witness." *See id.* at 53, 55. We acknowledge that case agents may have access to a broader range of factual information about an investigation than many other agents assigned to that same matter because they play a managerial role in supervising a particular law enforcement operation; nevertheless, both case agents and the individual agents they supervise equally approach a case primarily through an "investigative lens" rather than a "methodological" one. Accordingly, the testimony of any law enforcement agent who functions as both a fact and an expert witness is susceptible to the risks posed by such dual testimony. *Cf. Young,* 745 F.2d at 765–66 (Newman, J., concurring) (expressing concern about allowing non-supervisory law enforcement officials to testify in dual capacities).

■ In sum, although we have refused to prohibit categorically the use of law enforcement officials as experts, district courts must "avoid falling into error by being vigilant gatekeepers of such expert testimony to ensure that it is reliable and not substantially more unfairly prejudicial than probative." *Dukagjini,* 326 F.3d at 56 (internal citations omitted). Unfortunately, the district court in this instance failed to satisfy its obligations as a gatekeeper. The court not only allowed the government to overreach by admitting ex-

pert testimony regarding the meaning of words that did not fall within the ambit of drug jargon, but also actively assisted the government in leading Tully to stray from the scope of his expertise.[2]

An expert witness called on to testify about the meaning of narcotics codes strays from the scope of his expertise when he interprets ambiguous words or phrases and there is no evidence that these terms were drug codes. *See id.* at 55. Here, the government, at the prompting of the district court, sought to procure Tully's expert opinion regarding the meaning of the phrase "to watch someone's back." However, there is no evidence in the record that this phrase constituted a drug code. In the absence of such evidence, this is an ambiguous phrase that, without more, may refer to any number of situations that are not related to narcotics transactions.

We do not doubt that this phrase describes conduct that may well take place during drug deals; people have repeatedly agreed "to watch" someone else's "back" in the course of narcotics transactions. *See, e.g., United States v. Mendoza*, 341 F.3d

---

**2.** We also note that the district court failed to fulfill its gatekeeping functions when the court improperly allowed Tully to testify as an expert witness despite the government's failure to indicate prior to trial that the prosecution would call him to testify in such a capacity. Rule 16 of the Federal Rules of Criminal Procedure "provides that the defense is entitled to discovery of a written summary of expert testimony that the government intends to use in its case-in-chief." *Dukagjini*, 326 F.3d at 56 (citing Fed.R.Crim.P. 16(a)(1)(G)). The rule "is intended to minimize [the] surprise that often results from unexpected testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *United States v. Figueroa–Lopez*, 125 F.3d 1241, 1246 (9th Cir.1997) (internal citation and quotation marks omitted). Moreover, "[t]he disclosure requirement creates an incentive for the government to limit its use of experts to proper subject matters of expert testimony, lest broader expert testimony require broader pre-trial disclosure." *Dukagjini*, 326 F.3d at 56.

Before Cruz's trial began, the government informed defense counsel pursuant to Rule 16 that the prosecution would notify him "in a timely fashion of any expert the government intends to call at trial" and would provide him with "a summary of the expert's opinion and qualifications." Subsequently, the government notified defense counsel pursuant to Rule 16 that it would call Special Agent Michael Broderick of the DEA "as an expert in the distribution and pricing of heroin." Although the notice explicitly disclosed the government's intention to call Broderick as an expert witness, the government's notice failed to indicate that the prosecution would also call Tully to testify as an expert at the trial.

Generally, the government's duty to disclose a summary of expert testimony is not triggered unless the defendant requests such a summary. *See United States v. Johnson*, 228 F.3d 920, 924 (8th Cir.2000); *see also* Fed. R.Crim.P. 16(a)(1)(G) ("*At the defendant's request*, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.") (emphasis added). In this instance, the defendant never demanded this type of disclosure. Nonetheless, where as here the government represents to the defendant that it will comply with Rule 16's requirements pertaining to expert testimony, the government bears the burden of following through on that representation. *Cf. Johnson*, 228 F.3d at 924–25. In the proceedings below, the government failed to adhere to its representation regarding compliance with Rule 16 when the government did not notify defense counsel that the prosecution would call Tully to testify as an expert witness and nevertheless sought to elicit Tully's expert testimony at Cruz's trial. By doing so, the prosecution blindsided defense counsel with this testimony and undermined the goals of the very disclosure requirement which the government had assured defense counsel it would comply with. Under these circumstances, the district court improperly allowed Tully to begin testifying as an expert witness in the face of defense counsel's objections.

687, 690 (8th Cir.2003); *United States v. Taylor*, 13 F.3d 986, 988 (6th Cir.1994). Nevertheless, a person can agree "to watch someone's back" in furtherance of a wide variety of criminal endeavors. *See, e.g., United States v. Gaither*, 245 F.3d 1064, 1067 (9th Cir.2001) (accomplice agreed to "watch" the defendant's "back" during a bank robbery); *United States v. Rodriguez*, 925 F.2d 1049, 1050–51 (7th Cir.1991) (accomplice agreed to "watch[ ]" the defendant's "back" during the robbery of a postal carrier); *Commonwealth v. Carter*, 272 Pa.Super. 411, 416 A.2d 523, 524–25 (1979) (defendant agreed "to watch" a co-conspirator's "back" in a deadly confrontation with several men). In fact, Tully himself conceded on cross-examination that he had heard the phrase "[to] watch[ ] someone's back" used in contexts that had nothing to do with drug deals. As such, although Tully testified that a defendant who is present "to watch someone's back" is a "lookout" in a narcotics transaction, there is no reason to believe, in the absence of any evidence to the contrary in the record, that "lookouts" are employed solely during the course of narcotics-related activities. *See, e.g., Windham v. Merkle*, 163 F.3d 1092, 1102 (9th Cir.1998) (the petitioner served as a "lookout" during an armed assault); *United States v. Male Juvenile*, 121 F.3d 34, 37 (2d Cir.1997) (defendant told detectives that he acted as a "lookout" during a robbery).

We do not suggest that the aforementioned phrase could never be characterized as a drug code. We simply hold that the government failed to introduce evidence to demonstrate that the phrase constituted drug jargon with a fixed meaning within the narcotics world rather than a phrase that could have equally referred to activities with no relation to narcotics transactions. Under these circumstances, Tully strayed from the scope of his expertise

when he offered expert opinions regarding the meaning of this ambiguous phrase and the district court manifestly erred by not only allowing the government to elicit such testimony but actively prompting the government to do so.

## IV. *Sufficiency of the Evidence*

■ Cruz also argues that the evidence presented against him at trial was insufficient to support a conviction. A defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient. *See United States v. Marji*, 158 F.3d 60, 63 (2d Cir.1998). Further, when challenged on sufficiency grounds, a conviction will be affirmed if, viewing all the evidence in the light most favorable to the prosecution, "the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In other words, a conviction will be affirmed if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781. In situations where some government evidence was erroneously admitted, we must make our determination concerning sufficiency taking into consideration even the improperly admitted evidence. *Lockhart v. Nelson*, 488 U.S. 33, 39–40, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988); *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir.2002).

■ In this case, the government concedes that it sought to convict Cruz of possession with intent to distribute a substance containing heroin on the basis of "an aiding and abetting theory." An aiding and abetting conviction must be premised on "more than evidence of a general cognizance of criminal activity" or "suspicious circumstances." *United States v. Sa-*

*maria,* 239 F.3d 228, 233 (2d Cir.2001). Rather, "[t]o convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted, or failed to act in a way that the law required him to act, with the specific purpose of bringing about the underlying crime." *United States v. Labat,* 905 F.2d 18, 23 (2d Cir.1990). "To prove that the defendant acted with that specific intent, the government must show that he knew of the proposed crime." *Id.; see also United States v. Friedman,* 300 F.3d 111, 124 (2d Cir. 2002), *cert. denied,* 538 U.S. 981, 123 S.Ct. 1785, 155 L.Ed.2d 672 (2003) ("Charges of ... 'aiding and abetting' require the Government to prove, beyond a reasonable doubt, that the defendant knew the specific nature of the ... underlying crime."); *United States v. Pipola,* 83 F.3d 556, 562 (2d Cir.1996) ("To show specific intent, the prosecution must prove the defendant knew of the proposed crime."). "Proof that the defendant knew that *some* crime would be committed is not enough." *Friedman,* 300 F.3d at 124. Moreover, a defendant's "mere presence at the scene of a crime, even when coupled with knowledge that at the moment a crime is being committed, is insufficient to prove aiding and abetting.... Guilt may not be inferred from mere association with a guilty party." *United States v. Johnson,* 513 F.2d 819, 823–24 (2d Cir.1975).

■ Even crediting all of Tully's expert testimony, the record is devoid, by and large, of any evidence that Cruz knew that Medina possessed drugs or that he intended to sell drugs to Ramos. Cruz initially agreed to assault several Ecuadorians, not to assist Medina with a narcotics transaction. Although Cruz later agreed "to watch" Medina's "back" during a "deal,"

Tully acknowledged that Cruz informed Fleming that he did not know the deal in question was a drug deal. Moreover, Cruz later told Tully that he "didn't know what kind of deal" would be taking place. Furthermore, while Cruz was present in the Boston Market as Medina negotiated a narcotics transaction with Ramos, he did not sit at Medina's table during those negotiations; rather, Cruz sat several tables away, and Ramos cast doubt on whether the defendant could have overheard the discussions about the heroin since Ramos and Medina were "talking in a low voice." In addition, despite the government's observation that Cruz approached the Boston Market in a "surveillance conscious manner," testimony to that effect did not categorically suggest that Cruz engaged in such so-called "countersurveillance" because he knew Medina was engaged in a narcotics transaction and hoped to further the commission of that crime. Finally, although Cruz was the driver of the Lincoln Town Car in which Ramos found the heroin, there is no evidence to suggest that Cruz had been aware of the presence of narcotics in the car before Medina drew Ramos' attention to the heroin; Cruz was sitting in the driver's seat of the Lincoln Town Car whereas the heroin was hidden in the back of the vehicle inside both a telephone box and a plastic bag. The trial record does not indicate that Cruz discussed the contents of that package with Medina as they drove to the Boston Market to meet with Ramos or that he somehow managed to see the heroin hidden therein from his vantage point in the Town Car.

■ In essence, the trial record, absent Tully's improperly admitted testimony, reflects that Cruz was present at the scene of the crime and likely knew that

some type of crime was being committed.[3] Even when we take into account Tully's expert testimony, there is little evidence in the record which suggests that Cruz knew of the specific crime Medina proposed to commit or that Cruz intended to facilitate such a crime. *Samaria,* 239 F.3d at 233. Although the government may prove the requisite knowledge and specific intent by circumstantial evidence, that evidence must still include some indicia of the specific elements of the underlying crime. For example, such indicia could include conversations directly related to the substance of the illegal activity, possession of documents related to the crime, exercise of authority within a conspiracy, receiving a share of the profits from the deal, or explicit confirmation of the nature of the crime. *Id.* at 235 (gathering cases). Here, none of these direct indicia of intent and knowledge are present. Instead, the record encompasses little more than Cruz's statement that he would "watch [Medina's] back" and Tully's testimony linking this statement to narcotics transactions. Such a tenuous link is clearly insufficient to meet the burden imposed on the prosecution to prove guilt beyond a reasonable doubt.

Viewing all the evidence in the light most favorable to the government and drawing all permissible inferences in its favor, the most the prosecution demonstrated here with its circumstantial evidence was that Cruz acted as a lookout for Medina. In other cases where defendants have acted as lookouts, however, we have upheld convictions only when *other* indicia of the elements of the underlying substantive offense including knowledge and intent have been in evidence. *See United States v. Pitre,* 960 F.2d 1112, 1121–22 (2d Cir.1992) (upholding conspiracy conviction for serving as a lookout for a narcotics transaction when other evidence showed that defendants knowingly and intentionally participated in the drug conspiracy); *United States v. Torres,* 845 F.2d 1165, 1168 (2d Cir.1988) (upholding conspiracy conviction on lookout theory when defendant was identified as the source of the drugs). Our sister circuits have also held that mere evidence the defendant acted as a lookout will not suffice to prove knowledge and specific intent. *See, e.g., United States v. Dean,* 59 F.3d 1479, 1487 (5th Cir.1995) (finding that evidence sufficient to show that defendant was acting as a lookout was not sufficient to show that he knew what he was protecting); *United States v. Wexler,* 838 F.2d 88, 91–92 (3d Cir.1988) (finding that even though defendant acted as a lookout, absence of evidence linking defendant to the specific object of the crime was fatal to prosecution). Similarly here, even if we credit Tully's testimony, the government has established that Cruz was acting as a lookout for Medina but has not offered anything to directly connect Cruz to the transaction and prove the requisite knowledge and intent needed for an aiding and abetting conviction. As we have held numerous times before, the defendant's mere presence at the scene of the crime or association with wrongdoers does not constitute intentional participation in the crime, even if the defendant had knowledge of the criminal activity. Where, as here, no more direct link between the defendant's actions as a lookout and the underlying elements of the crime is offered by the government, circumstantial evidence will be insufficient to support an aiding and abetting convic-

---

**3.** Tully's testimony regarding Cruz's post-arrest statements does suggest that Cruz may have suspected that he and Medina "were going to be delivering drugs." However, "suspicion that the [proposed crime] might occur is not enough" to prove that a defendant *knew* of the proposed crime. *Pipola,* 83 F.3d at 562.

tion. Thus, we conclude that the record evidence here does not support the conclusion that a reasonable factfinder could have found Cruz guilty beyond a reasonable doubt.

## CONCLUSION

The district court erred in allowing Special Agent Mark Tully to offer expert testimony regarding the meaning of the phrase "there to watch someone's back." However, even when we take into account this improperly admitted testimony, we conclude that the prosecution failed to offer proof sufficient to convince a reasonable jury beyond a reasonable doubt that Cruz was guilty of aiding and abetting the drug transaction at issue in this appeal. Therefore, we reverse Cruz's conviction and remand with instructions to enter a judgment of acquittal.