Artel HOPKINS, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 540,2004.

Supreme Court of Delaware.

Submitted: Feb. 1, 2006.
Decided: March 2, 2006.

John S. Malik, Wilmington, Delaware for appellant.

Kim Ayvazian, Department of Justice, Georgetown, Delaware for appellee.

Before STEELE, Chief Justice, HOLLAND and RIDGELY, Justices.

STEELE, Chief Justice.

The defendant, Artel Hopkins, appeals his convictions in Superior Court for Trafficking in Cocaine of 100 Grams or Greater, Possession with Intent to Deliver Cocaine, Maintaining a Building for Keeping Controlled Substances, Conspiracy Second Degree, and Possession of Drug Parapher-

nalia. Before trial, Hopkins made a discovery request. The State responded that it intended to call an expert witness to testify that the drugs were possessed with the intent to distribute rather than for personal use. During the course of trial, the State played a surveillance videotape of the drug transaction in which Hopkins uttered a phrase in the vernacular of the drug trade. The State later recalled its expert to testify to the meaning of the phrase. The defendant objected that the expert's testimony on recall was outside the scope of the State's discovery response and asked the trial judge to exclude the testimony as a sanction for the State's alleged discovery violation. After hearing arguments from both sides, the trial judge ruled that the proposed expert testimony interpreting the vernacular drug phrase was within the scope of the State's discovery response and that the State did not violate its discovery obligations. Hopkins appeals this ruling. He also claims that there was insufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that he maintained a building for keeping controlled substances. We agree with the trial judge that the State did not violate its discovery obligations and that the proposed expert testimony was within the scope of the State's discovery response. We further conclude that there was sufficient evidence supporting the maintaining a building conviction. Therefore, we affirm the convictions.

### Fact and Procedural History

In February 2000, police arrested Pedro Marte for cocaine trafficking at the Best Western Hotel in Seaford, Delaware. Marte pleaded guilty to trafficking in cocaine and was sent to the Sussex Correctional Institute in September 2000. While Marte was incarcerated, he met Raymond Bacon. Marte told Bacon that he was a "kingpin" with access to "a lot of drugs."

The two also discussed the possibility of future drug transactions. On December 11, 2003, after serving thirty-nine months, Marte was released from prison.

Less than two months after his release from prison, Marte arranged the delivery of two kilograms of cocaine in Delaware. Detective Dan Wright, a member of the Delaware State Police Special Investigation Unit, initiated an investigation of Marte. On January 30, 2004, Wright arrested Marte for possession of the two kilograms of cocaine. Marte agreed to assist the DSP in their cocaine trafficking investigations in the hope of a favorable plea and sentencing recommendation. Marte informed Wright that he knew two people in Delaware who were actively seeking to buy large quantities of cocaine. One was Raymond Bacon. The DSP decided to conduct a "reverse" sting operation using Marte and cocaine provided by the police to set up a drug deal with Bacon. To set the operation in motion, Wright instructed Marte to contact Bacon.

On February 2, 2004, while Wright monitored the conversation, Marte placed a call to Bacon. Marte asked Bacon if he or anybody he knew might want to buy drugs. Bacon responded that his friend, "Artel" was interested. Artel Hopkins, the defendant below and appellant here, understood the conversation because he was with Bacon at the time Bacon spoke with Marte. Moreover, Bacon related portions of the conversation to Hopkins during the course of the telephone call. The parties agreed that Marte would sell Bacon and Hopkins two kilograms of cocaine for $47,000 with the understanding that Hopkins would provide the money. Marte informed Bacon that he would travel to Seaford the next day and call Bacon when he arrived. Bacon, in turn, informed Hopkins that Marte was coming down the next day. Marte and Bacon also discussed get-

ting a hotel room to carry out the transaction. Bacon seemed to like the idea of getting a hotel room because there they would be able to "cook" the cocaine to test its quality.

On February 3, 2004, the DSP rented two adjoining hotel rooms at the Best Western Hotel in Seaford, Delaware. The DSP set up video and audio surveillance of Room 307. They then picked Marte up from prison and escorted him to the hotel room. Once there, Marte placed a telephone call to Bacon, who was riding in a car with Hopkins at the time, and told Bacon to meet him at the Best Western. After the phone call, Hopkins turned the car around and went south to Georgetown to get the $47,000. Hopkins went into a house on a back road and came out with a black bag containing the money. Hopkins and Bacon then drove to the Best Western.

When they arrived at the hotel, Bacon called Marte and asked Marte for his room number. Bacon then went to Room 307 while Hopkins remained in the vehicle in the parking lot. After entering the room, Bacon called Hopkins to tell him the room number. Either Bacon or Hopkins asked if there was a stove in the room. After finding out that there was not, Hopkins left the Best Western and drove to Wal–Mart and purchased a hot plate. Shortly thereafter, Hopkins returned to the Best Western and joined Bacon and Marte in Room 307. Hopkins entered Room 307 with a blue Wal–Mart bag and the black bag he picked up from the house in Georgetown. Hopkins also brought a digital scale, some baking soda he bought at another store, and a bag of rubber bands.

After Hopkins entered the room he placed the black bag on the bed. He opened it, grabbed a grocery bag that was inside the black bag and opened the grocery bag. The grocery bag contained the $47,000. Marte flipped through the stacks of money to make sure that there were no single dollars in the middle. Satisfied that there was actually $47,000 in the bag, Marte called a DSP detective who brought the drugs into the room and handed them to Marte. Hopkins indicated that he needed to test the cocaine because he had previously been "beat for six" (lost a large amount of money when he purchased drugs that were "not good."). While preparing to cook the cocaine, Hopkins reached into the bag with the cocaine while Bacon was plugging in the hot plate. At that point, the DSP came into the room and arrested everyone present.

Pursuant to Superior Court Criminal Rule 16(a)[1], Hopkins's defense attorneys filed two pre-trial discovery requests asking the State to disclose any expert testimony that it planned to introduce under D.R.E. 702, 703 and 705 including the names of any experts and a summary of the substance of their testimony. The State responded by indicating that it planned to call Wright "to testify as an expert that the drugs were possessed with the intent to deliver rather than for personal use." The State also advised that Wright's opinion would be "based upon his training and experience as well as the attendant circumstances with respect to this particular case."

During the course of Marte's direct testimony at trial, the State played the surveillance videotape of Room 307. In the

---

1. SUPERIOR COURT CRIMINAL RULE 16(a)(1)(E) provides that "Upon request of a defendant, the state shall disclose to the defendant any evidence which the state may present at trial under Rules 702, 703, or 705 of the Delaware Uniform Rules of Evidence. This disclosure shall be in the form of a written response that includes the identity of the witness and the substance of the opinions to be expressed."

videotape, Hopkins made the statement that he had previously been "beat for six." The State later recalled Wright. In questioning Wright, the prosecutor asked "do you recall a conversation about being 'beat for six'?" Wright began to explain what "beat for six" meant. Defense counsel then objected that the State had not laid the foundation to support Wright's expertise in interpreting drug code or lingo. The trial judge permitted the prosecutor to question Wright outside the presence of the jury to establish whether the detective was qualified as an expert to testify as a translator of the lingo of the drug trade.

After the questioning, defense counsel acknowledged that Wright was qualified to testify about the meaning of "beat for six" but objected to the testimony on the grounds that it was outside the scope of the State's response to the defense's Rule 16 request because the State's Rule 16 response only indicated that Wright would testify on the issue of whether the cocaine was possessed with the intent to deliver or for personal use. Defense counsel objected that this testimony surprised the defense and that had the defense known in advance of trial that Wright would so testify the defense would have sought an expert to counter Wright's "beat for six" interpretation. Accordingly, defense counsel urged the trial judge to sanction the State for the alleged discovery violation by excluding Wright's proposed testimony regarding the meaning of the vernacular phrase "beat for six."

After hearing arguments from each party and after a weekend break in the trial, the trial judge ruled that the Wright could testify about the meaning of "beat for six." In the presence of the jury, Wright explained that "beat for six," meant that

Hopkins had previously been "ripped off" in a drug deal. More specifically, Wright elaborated:

> The "beat" means that whatever—the "beat for six", six is a number. "Beat" means that whatever Mr. Hopkins was intending to get, he did not get. In that case, he was saying he was beat for six. . . . We were in the middle of a two-kilo cocaine deal and Mr. Hopkins is being apologetic to a subject he had never met before. He doesn't want to offend a possible supplier in the future, so he is apologizing and stating that he wants to test it because he had been beat or ripped off or did not get exactly what he wanted, and the six would be the kilos of cocaine.

Hopkins appeals from the trial judge's ruling allowing the State to present the testimony interpreting "beat for six" claiming that the trial judge erred because the facts support the conclusion that the State violated Superior Court Criminal Rule 16 and the trial judge erroneously concluded that there was no discovery violation. Hopkins also argues that there was insufficient evidence to support a conviction of Maintaining a Building for Keeping Controlled Substances. Using a narrow dictionary definition of "maintain," Hopkins contends that because the DSP rented the hotel room and because he was only in the room for "several fleeting minutes before he was arrested," his conviction for Maintaining a Building cannot stand.

1. *The State's alleged Superior Court Criminal Rule 16 discovery violation.*

 We review alleged discovery violations and will reverse a trial judge's ruling only "if the substantial rights of the accused are prejudicially affected." [2]

---

**2.** *Secrest v. State*, 679 A.2d 58, 63 (Del.1996) (citing *Ray v. State*, 587 A.2d 439, 441 (Del. 1991)).

When reviewing a discovery violation, we apply a three part test examining: (1) the centrality of the error to the case; (2) the closeness of the case; and (3) the steps taken to mitigate the results of the error.[3] When a trial judge finds that the State has committed a discovery violation, he has "broad discretion to fashion the appropriate sanction."[4] In this case, however, we must first determine whether or not the trial judge correctly held that the State committed no Rule 16 violation. Both parties suggest that our review is *de novo*. We will, however, review this decision for an abuse of discretion.[5] Because we agree with the trial judge that the State did not violate Rule 16, we need not engage in the three-part test to determine whether Hopkins's substantial rights were prejudicially affected. Accordingly, Hopkins's appeal on this issue must fail.[6]

As noted above, the State responded to the Hopkins's pre-trial Rule 16(a) discovery request regarding expert opinions and the substance thereof by informing Hopkins that it intended to call Wright to:

> testify as an expert that the drugs were possessed with the intent to deliver rather than for personal use. Det. Wright's opinion will be based upon his training and experience as well as the attendant circumstances with respect to this particular case.

The trial judge concluded that Wright's expert testimony about the meaning of "beat for six" fell within the scope of the State's discovery response. We agree with the trial judge's ruling and rationale. In explaining his decision the trial judge noted:

> In the context of the drug trade where significant weight transactions are involved and in the context of the evidence in this case, Detective Wright's opinion is that "beat for six" means that the defendant previously had been hoodwinked on a kilo transaction. This ex-

---

**3.** *Ray,* 587 A.2d at 441 (quoting *Skinner v. State,* 575 A.2d 1108, 1126 (Del.1990)).

**4.** *Cabrera v. State,* 840 A.2d 1256, 1263 (Del. 2004).

**5.** Hopkins cites *Secrest,* 679 A.2d at 63, n. 7 to support the proposition that our review is *de novo.* The State did not contest that this standard applies. In *Secrest,* the defendant claimed that the State violated Rule 16 by failing to disclose that it intended to offer certain expert testimony. Citing *Ray v. State,* 587 A.2d 439 (1991) Secrest argued that we should review the issue under an abuse of discretion standard. In footnote 7, we explained that in *Ray* we "appeared to apply, however, plenary review." *Secrest*'s footnote 7 creates some confusion about the appropriate standard of review in cases like this one. To clear up that confusion, we set forth the general rule: while we review a trial judge's *interpretation* of the Superior Court Rules relating to discovery *de novo,* we review the trial judge's *application* of those rules for an abuse of discretion. *See Jackson v. State,* 654 A.2d 829, 832 (Del.1995) ("[A]s a Court of last

resort, this Court's interpretation of the applicability of rules of court, as well as statutes, must control."); *ABB Flakt, Inc. v. National Union Fire Ins. Co.,* 731 A.2d 811, 815 (Del. 1999) ("This Court reviews a trial court's application of discovery rules for abuse of discretion."); *Pepsico, Inc. v. Pepsi–Cola Bottling Co.,* 261 A.2d 520, 521 (Del.1969) ("[A]ll discovery rulings are interlocutory and discretionary.")

**6.** Because we find that the State did not violate its obligations under Rule 16, we need not discuss Hopkins's conclusory claim that he was "denied his state and federal constitutional rights to a fair trial when the trial court admitted into evidence expert testimony interpreting the drug lingo...." *See e.g., United States v. Johnson,* 228 F.3d 920, 924 (8th Cir.2000) (citing *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977)) ("Criminal defendants do not have a general constitutional right to discovery [citation]. In most circumstances, then, a defendant must point to a statute, rule of criminal procedure, or other entitlement to obtain discovery from the government.")

plains why the defendant appeared to be apologetic and why the two kilos of cocaine would be tested, all of which shows the defendant's commercial interest and intent.

Without expert opinion to translate it, the phrase would be meaningless to the jury. The defendant contends that the evidence should be excluded under Criminal Rule 16. Criminal Rule 16 requires that experts be identified and the substance and grounds of their opinions be disclosed upon request.

The State did respond to the defense request on this subject. Wright was identified as an expert in the Special Investigations Unit. The subject matter of the opinion was that the defendant possessed cocaine with the intent to deliver cocaine. Further, that the defendant did not intend the cocaine for personal use.

The phrase "beat for six" supports the commercial nature of the transaction. It is within the umbrella of the disclosed area of Wright's opinion. The defendant's words, as translated, are part and parcel of the commercial venture and enterprise.

Further, the defendant had also been supplied with the video-tape which had the recorded statement. Both defendant's present and former counsel had access to them. It should come as no surprise that the defendant made the statement. It should also come as no surprise that the disclosed expert would be asked questions as to what the phrase meant from a commercial or personal perspective in the context of this case.... I do not find a Rule 16 violation in this case.

Given that the defense had access to the tape before trial, that the State disclosed that Wright was going to testify at trial about the commercial nature of the transaction, and that Hopkins apparently uttered the phrase "beat for six" apologetically to explain why he wanted to test the quality of the two kilograms of cocaine in this case, we agree with the trial judge that "beat for six" supports the commercial nature of the transaction and is thus within the scope of the State's discovery response that Wright would be called to offer his view on why the transaction was "commercial" and not personal. Thus it was not error to allow Wright to interpret the phrase "beat for six" for the jury.[7]

 Hopkins suggests that permitting the State to make overly broad statements about the subject matter of an expert witness's proposed testimony and then to argue that a very specialized and specific area of expert testimony falls within the scope of the overly broad disclosed areas of the expert's opinion makes a mockery of Rule 16 and renders it meaningless to discovery's goals of avoiding surprise and streamlining substantive trial preparation. As a general matter we agree. Indeed, we have emphasized this same concern in the past: "When the defense makes specific authorized discovery

---

7. Although the trial judge determined that there was no Rule 16 violation, he also engaged in an alternative and hypothetical prejudice analysis and concluded that even if there was a violation, it was "technical and no more than inadvertent.... Nothing supports the idea that the State had a motive to hide and sandbag the defendant with this evidence. Indeed, there are other statements and evidence which suggest that the defendant was previously involved with drugs commercially." The trial judge also concluded that the defendant suffered no prejudice: "the defendant had reason to know, from all the evidence, that his prior commercial involvement with drugs was known and in play for this trial." As we noted, however, because we agree that no Rule 16 violation occurred, we need not reach the issue of prejudice.

demands, the State should make specific and accurate replies....When the State provides a casual reply in answer to specific defense demands, the State is to be held accountable for any inaccuracies in its general reply."[8] In this case, however, the State's response was neither casual nor inaccurate.[9] Importantly, in our view, defense counsel had access to the videotape before the trial, could hear the "beat for six" comment in the tape, and could assess before trial its implication for the scope and context of Wright's expected testimony about the commercial nature of the thwarted transaction and Hopkins's explanation about why he needed to test the cocaine. Defense counsel knew or should have suspected that Wright's testimony concerning the commercial nature of the transaction might include comments explaining why Hopkins needed to test the cocaine. Thus, we conclude that defense counsel was neither unfairly surprised nor did the State's response render defense counsel's substantive trial preparation meaningless.

Hopkins relies on several cases to support his argument that the State violated its Rule 16 discovery obligations here. These cases are factually distinguishable. He relies most heavily on *United State v. Cruz.*[10] In *Cruz,* also a case involving a drug sting operation, the government disclosed that it planned to call one DEA agent to testify as an expert in the distribution and pricing of heroin.[11] During

trial, in addition to calling the first DEA agent as an expert witness, the government called a second DEA agent as a fact witness to testify "about what he had seen during [the] surveillance operation."[12] The second DEA agent testified about several statements the defendant made after his arrest. Specifically, the defendant explained that he was present at the location "to watch" the "back" of a participant in the drug deal. After the second DEA agent related the defendant's statement, the prosecutor asked the agent to explain the meaning of the phrase "to watch someone's back." The second DEA agent responded that an individual who "watches someone's back" is synonymous with a "lookout" in a "narcotics transaction."[13] The government agreed that this interpretation was expert testimony from a fact witness.

The Second Circuit explained that it is:

well settled that the government may elicit expert testimony from a properly qualified expert witness regarding the parlance of the narcotics trade and the meaning thereof [because] drug dealers often camouflage their discussions... [Therefore] expert testimony explaining the meaning of code words may assist the trier of fact to understand the evidence or to determine a fact in issue.[14]

Nonetheless, the court concluded that the trial judge erred by allowing the government to overreach by admitting expert

---

**8.** *Johnson v. State,* 550 A.2d 903, 910–911 (Del.1988).

**9.** While a more precise discovery response might have been more helpful to the defense, the State did not intentionally nor inadvertently disguise the basis for and nature of Wright's proposed testimony. As a matter of best practices, the State can and should easily avoid litigating these issues at trial and on appeal by erring on the side of more precise and detailed discovery responses.

**10.** 363 F.3d 187 (2nd Cir.2004).

**11.** *Id.* at 196, n. 2.

**12.** *Id.* at 193.

**13.** *Id.*

**14.** *Id.* at *194.*

testimony from a fact witness not disclosed as an expert in pre-trial discovery responses, particularly when the interpreted phrase did not fall within the ambit of drug jargon.[15] There was no evidence in the record that the meaning of the phrase "to watch someone's back" constituted a drug code.[16] "In the absence of such evidence, this is an ambiguous phrase that, without more, may refer to any number of situations that are not related to narcotics transactions."[17] Under the circumstances, the second DEA agent "strayed from the scope of his expertise when he offered expert opinions regarding the meaning" of the ambiguous phrase.[18]

Unlike the government in *Cruz*, here the State did disclose that it was going to call Wright as an expert witness in pretrial discovery. Moreover, the meaning of the unambiguous phrase "beat for six" was intertwined with the commercial nature of the transaction and Hopkins's explanation for why he needed to cook the cocaine. Finally, Wright neither strayed from the scope of his expertise nor from the scope of the State's pretrial discovery. *Cruz* is distinguishable and, therefore, not persuasive.

15. *Id.* at 195–196, 199.

16. *Id.* at 196.

17. *Id.*

18. *Id.* at 197. The Second Circuit also chastised the government for failing to adhere to its representation regarding compliance with the federal version of Rule 16, noting that the prosecution did not notify the defense counsel that it would call the second DEA agent as an expert witness at all. Thus, the district court erred in allowing the second DEA agent to testify as an expert witness in the face of the defendant's objections. *Id.* at 196, n2.

19. 679 A.2d 58 (Del.1996).

20. *Id. at* 61–63.

21. *Id. at* 64.

Hopkins also relies on *Secrest v. State*.[19] In *Secrest*, a second degree murder case arising out of a automobile collision, the State's expert initially testified about "accident reconstruction." On rebuttal, the State recalled the expert to testify based on his knowledge of "occupant kinematics" that the defendant was the driver and the victim was the passenger. The defendant objected to the admission of the testimony based on "occupant kinematics" because the state failed to disclose that it intended to offer that expert opinion.[20] While reversing on other grounds, we agreed that there was a disclosure violation.[21]

■ *Secrest* provides very little guidance in the case at bar. As should be obvious, determining whether the State violated its discovery obligations by failing to make required Rule 16 disclosures is a fact-intensive inquiry that must conducted on a case-by-case basis. Similarly, the other cases Hopkins cites stand for the correct general rule of law but provide little help in engaging in the contextual inquiry about whether the State violated its discovery obligations in this case.[22]

22. Hopkins also cites *Condon v. State*, 597 A.2d 7 (Del.1991) (State could not have presented expert testimony concerning gradual disclosure by victims of sexual abuse on direct examination because it failed to give adequate pre-trial notice of the intent to use the testimony, but the State could offer the expert testimony on redirect after the defense opened the door.); *Wheat v. State*, 527 A.2d 269 (Del.1987) (To use expert testimony to provide trier of fact background cornering behavior of an alleged child abuse victim based on expert's experience the State must provide notice of its intention to use such a witness sufficiently in advance of trial to enable the defendant to prepare to cross-examine the witness.); *United States v. Soto–Beniquez*, 356 F.3d 1 (1st Cir.2003) (Trial judge compensated defendants for government's failure to adhere to technical requirements of Fed.R.Crim.P. 16 by certifying the witness

Based on the foregoing, we conclude that the State neither violated its Rule 16 discovery obligation nor offered testimony outside the scope of its discovery response. Accordingly, Hopkins first claim on appeal fails.

2. *Hopkins's claim that there was insufficient evidence to convict him of Maintaining a Building for Keeping Controlled Substances.*

 Hopkins argues that the State failed to present sufficient evidence to convict him of Maintaining a Building for Keeping Controlled Substances in its case in chief. We review *de novo* a trial judge's denial of a defendant's motion for a judgment of acquittal to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt of all the elements of the crime.[23] In this case, Hopkins never moved for a judgment of acquittal before the trial judge. Therefore, our standard of review is plain error.[24] "Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[25] Even under a *de novo* standard, however, we are satisfied that there was sufficient evidence for a rational finder of fact, viewing the evidence in the light most favorable to the state, to find Hopkins guilty beyond a reasonable doubt.

Hopkins argues that the word "maintain" is not defined in the statute and that,

therefore, we must use the "common dictionary definition." He defines "maintain" very narrowly suggesting that "to maintain" "is to make a situation continue in the same way as before." Because the DSP leased the hotel room and he was only in the room for fleeting minutes before he was arrested, Hopkins suggests that his presence in the room was "merely incidental." As such, Hopkins concludes, a rational trier of fact could not have found that he did anything to "maintain" or "keep" Room 307 for the purpose of delivering or keeping controlled substances. We disagree.

Hopkins was convicted under 16 Del. C. § 4755(a)(5), which provides that it is a crime for a person:

> Knowingly to *keep or maintain* any store, shop, warehouse, *dwelling, building,* vehicle, boat, aircraft or other structure or place which is resorted to by persons using controlled substances ... for the purpose of using these substances or which is used for keeping or delivering them ....

In *Priest v. State*[26], we examined the application of this statute to the crime of "Maintaining a Vehicle for Keeping Controlled Substances." After examining the relevant "Maintaining a Vehicle" jurisprudence, we set forth the general rule that "the critical benchmark for determining the sufficiency of the evidence in a Maintaining a Vehicle prosecution has been the degree of the defendant's control *or use* of the vehicle in connection with the possession of drugs."[27] We also noted that "the

only as a ballistics expert and refusing to certify him as a firearms expert.).

23. *Priest v. State*, 879 A.2d 575, 577 (Del. 2005) (citing *Hardin v. State*, 844 A.2d 982, 989 (Del.2004)).

24. *Hainey v. State*, 878 A.2d 430, 433 (Del. 2005).

25. *Wainwright v. State*, 504 A.2d 1096, 1100 (Del.1986).

26. 879 A.2d 575 (Del.2005).

27. *Id.* at 579–580 (emphasis added) (discussing *State v. Rhinehardt*, 1990 WL 9509, 1990 Del Super. LEXIS 9 (Del. Super 1990), *Lonergan v. State*, 590 A.2d 502 (Del.1991); *McNul-*

crucial inquiry [was] whether [the defendant] knew that he was using the car to facilitate ... [the] attempted drug deal." [28] Thus we held, that to "sustain a finding of guilt on a Maintaining a Vehicle charge, the State must offer evidence of some affirmative activity by the defendant to utilize the vehicle to facilitate the possession, delivery, or use of controlled substances." [29]

■ Given the structure of the statute and our interpretation in *Priest* with respect to vehicles, we see no need to resort to the dictionary definition of the word "maintain" to determine whether the evidence is sufficient to sustain Hopkins's conviction for "Maintaining a Building." Instead, we will apply the *Priest* inquiry to analyze the sufficiency of evidence for all "Maintaining" charges under § 4755(a)(5) regardless of the type of vehicle or structure involved. Thus, in this case, we must determine whether the State offered evidence of some affirmative activity by Hopkins to use the hotel room to facilitate the possession, delivery, or use of cocaine. In conducting this inquiry we note that "ownership of the [building] is not required under the statute" and that a single incident of using a building to facilitate a drug deal is sufficient to convict.[30] Thus, the crucial inquiry here is whether Hopkins knew that he was using the hotel room to facilitate the attempted drug deal.

The companion cases of *Priest* and *Fletcher* provide useful guides in making this determination. The cases both arose out of the same incident. Deborah Powell drove to the Manchester Square Apartments in Dover looking for a friend. Fletcher, who was seeking transportation to buy crack cocaine, approached Powell and asked to borrow her car. He promised Powell a small amount of money or cocaine in return for the use of the car. Powell refused to lend Fletcher her car, but agreed to drive him to a nearby Bob Evans restaurant. Priest, who was not present during this conversation, arrived later and joined Fletcher in Powell's car. With Fletcher sitting in the front passenger seat and Priest in the rear, Powell drove both men to the Bob Evans. Once there, Powell and Priest waited in the car while Fletcher went into the restaurant. Thirty or forty seconds later, Fletcher returned to the car and told Powell, "they're not here." [31]

As they were leaving the restaurant parking lot, Powell failed to signal when she made a turn. A police officer who was conducting undercover surveillance in the area pulled them over. Powell testified that when the police pulled them over Fletcher told Priest "you better run." As the police were approaching the car, Powell heard her glove box open and close and she saw Fletcher fumbling with something. She also observed Priest shoving something down into the back seat cushion. When the

ty v. State, 655 A.2d 1214 (Del.1995); *Watson v. State,* 755 A.2d 390 (Del.2000)(TABLE); and *Fletcher v. State,* 2005 WL 646841, 2005 Del. LEXIS 124 (Del.2005)).

28. *Id.* at 580.

29. *Id.* at 576.

30. *Fletcher v. State,* 2005 WL 646841, *3, 2005 Del. LEXIS 124, *8 (Del.2005). Because Hopkins did not make the argument on appeal, there is no need for us to address

footnote 22 of *Priest* in which we explained that most, if not all, other Uniform Controlled Substances Act jurisdictions reject the "single occurrence" approach to "Maintaining" convictions that Delaware endorses. As in *Priest,* "we have no occasion to reassess our position vis-à-vis the other states."

31. *See Fletcher,* 2005 WL 646841, at *1, 2005 Del. LEXIS 124 at*2–*3, *Priest,* 879 A.2d at 576–577.

police searched the car they found cocaine in the glove box, a digital scale in the side pocket of the passenger door, and a loaded handgun in the crevice of the back seat.[32]

Both Priest and Fletcher were convicted of Maintaining a Vehicle for Keeping Controlled Substances. Both appealed. We affirmed Fletcher's convictions and reversed Priest's. In so doing, we noted that Fletcher had "actual possession and control over the cocaine, and that he personally solicited Powell to give him a ride." [33] Thus, there was "significant evidence of [Fletcher's] direct involvement in maintaining the vehicle."

Conversely, in Priest, we explained that the crucial inquiry was whether Priest knew he was using the car to facilitate Fletcher's drug deal, "not whether Priest knew only that Fletcher was about to buy drugs, with Priest happenstance being present in the car alongside Fletcher." [34] We acknowledged that it is possible "to imagine a scenario where a passenger's actions might adequately demonstrate his knowledge that the vehicle was kept or maintained for illegal drug activity," but that the facts did not support that scenario.[35]

In this case, although Bacon and Marte spoke about leasing the hotel room and the DSP actually leased it, Hopkins had sufficient involvement and knowledge that the room was to be used to facilitate the attempted drug deal. Upon finding out that there was no stove in the room, Hopkins left to purchase a hot plate. After purchasing the hot plate, Hopkins returned to the room with hot plate, baking soda, a digital scale, and $47,000. Right before the DSP burst into the room, Hopkins was handling the cocaine while Bacon was plugging in the hot plate.

The facts here are closer to Fletcher than Priest. Hopkins is like the passenger in the scenario we imagined in Priest. He had knowledge that the room was leased for illegal drug activity, his presence was not happenstance, and he, himself, was getting ready to spend $47,000 to buy cocaine. He brought drug paraphernalia in order to test the quality of the cocaine and to facilitate the transaction. The hotel room was essential to Hopkins in order to consummate the drug deal. The fact that the DSP paid the bill and actually leased the room is of no consequence. Moreover, here, as in Fletcher, there was significant evidence of Hopkins's "direct involvement" in maintaining the hotel room. Hopkins had knowledge that the room would facilitate the illegal drug activity by serving as a convenient locale where the drugs could be "cooked" to determine their authenticity. Even under a de novo standard of review, we conclude that there was sufficient evidence to support Hopkins's conviction for Maintaining a Building for Keeping Controlled Substances.[36]

---

32. Fletcher, 2005 WL 646841, at*1, 2005 Del LEXIS 124 at*2–3.

33. Id. 2005 WL 646841, at *3, 2005 Del LEXIS, at *9–10.

34. Priest, 879 A.2d at 580.

35. Id. See e.g., Thomas v. State, 2005 WL 3031636, 2005 Del. LEXIS 457 (Del.2005).

36. The jury instructions in this case first set forth the offense of Maintaining a Dwelling by quoting the relevant portion of § 4755(a)(5). The instructions then stated that in order to find Hopkins guilty of the offense that the jury must find that the State established beyond a reasonable doubt:

(1) That the defendant kept or maintained a dwelling, in this case, Room 307 . . . ; and,

(2) The dwelling was used to keep controlled substances in violation of the Uniform Controlled Substances Act; namely, for the purposes of using these substances

## Conclusion

For the foregoing reasons, the judgments of the Superior Court are AFFIRMED.

or for the purpose of keeping or delivering controlled substances; and,

(3) The defendant acted knowingly with regard to such activity at Room 307 .... A person acts knowingly when the person knows or is aware of such activity ....

These jury instructions captured the essence of the holding in *Priest*. We wish to emphasize that in all cases involving charges for "maintaining" under § 4755(a)(5) the jury instructions should include some language setting forth the rule we articulated in *Priest:* "the State must offer evidence of some affirmative activity by the defendant to utilize the vehicle [building, dwelling, etc.] to facilitate the possession, delivery, or use of controlled substances."