Larry L. WRIGHT,[1] Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 68, 2011.

Supreme Court of Delaware.

Submitted: July 13, 2011.

Decided: Aug. 1, 2011.

1. The Court, *sua sponte,* has assigned pseudo-nyms to all parties pursuant to Supreme Court Rule 7(d).

Bruce A. Rogers, Esquire, of Bruce A. Rogers, P.A., Georgetown, Delaware; for Appellant.

Abby Adams, Esquire, Department of Justice, Georgetown, Delaware; for Appellee.

Before STEELE, Chief Justice, BERGER and JACOBS, Justices.

JACOBS, Justice:

Larry L. Wright ("Wright"), the defendant-below, appeals from a Family Court order finding him delinquent of, and sentencing him for, the offenses of Assault in the First Degree,[2] Reckless Endangering in the First Degree,[3] and Offensive Touching.[4] On appeal, Wright challenges two of the Family Court's evidentiary rulings, and claims that there was insufficient evidence to support that court's adjudication of delinquency on all three charges. We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 23, 2010, Joseph Taylor and his girlfriend, Naomi Stewart, went to Delmar Park to "hang out" after school. While at the park, Stewart saw Wright (whom she had previously dated), and sent him a text message that he had a "nice car." Shortly after receiving that message, Wright approached Stewart and Taylor, who were sitting together on a park bench. Wright asked Taylor why he (Taylor) had his arm around "my girlfriend." Taylor did not respond, but Stewart told Wright to "go away." Wright left and went back to his car.

Shortly thereafter, Taylor and Stewart decided to leave the park and began walking down the street towards the public library. As the two were walking, Wright

sped by in his car. After pulling into a parking lot across the street and exiting his car, Wright started walking across the street, yelling at Taylor. To prevent Wright from reaching Taylor, Stewart moved into the middle of the street to intercept Wright and told Taylor to keep walking.

Stewart's effort was ultimately unsuccessful. Taylor, who had continued walking as Stewart instructed, looked back and (he claims) saw Wright pushing Stewart. Taylor walked back to the middle of the street where Stewart and Wright were standing. Meanwhile, Wright elbowed Stewart under her eye and pushed her out of the way. Wright then punched Taylor on the left side of his head, causing Taylor to lose feeling in his upper body and keel over. After Taylor managed to stand up, he and Stewart walked to the street corner and called the police on Taylor's cell phone.

This altercation, which took place on the street in front of a fire station, was witnessed by Denise Lewis, a local high school teacher. Lewis was driving by in her car when she saw Wright strike Taylor twice. Lewis honked her horn and yelled at Wright to stop. Wright then ran back to his car and drove off.

When the police arrived, Taylor gave a statement to Officer Justin Smithhart of the Delmar Police Department. Taylor also asked to be "checked out," because he had a headache and was dizzy. Carl Haggerty, a paramedic who was treating Taylor, observed that Taylor had "a large swelling" near his temple region on his head, and that Taylor's blood pressure was "excessively high."[5] In the ambulance en

**2.** 11 *Del. C.* § 613.

**3.** 11 *Del. C.* § 604.

**4.** 11 *Del. C.* § 601.

**5.** Glen Marshall, the other EMS treating Taylor, also reported observing similar symptoms.

route to hospital, Taylor began to feel nauseous and began throwing up. He also became disoriented and started drifting in and out of consciousness.

Taylor was rushed to Nanticoke Memorial Hospital in Seaford, Delaware, where he was diagnosed with a skull fracture with an intracranial hemorrhage and swelling. From there, Taylor was flown to Peninsula Regional Medical Center ("PRMC") in Salisbury, Maryland so that a neurosurgeon could repair the intracranial bleeding. Had the bleeding not been stopped, Taylor's brain could have herniated, causing a massive stroke and possibly death. Taylor was hospitalized for three to four days. Less than a week later, he was re-admitted to PRMC after experiencing blurred vision and blackouts. He remained there for an additional three days. Upon his discharge, Taylor was unable to return to school full-time, because he suffered from seizures and blackouts and could stay awake for only a few hours at a time. Taylor also required physical therapy twice a week at Nanticoke Rehabilitation Center for his reading and math functions, which had been impaired as a result of the episode.

Wright was arrested and charged with first-degree assault, first-degree reckless endangering, and offensive touching. The Family Court held a two-day trial on December 6, 2010 and February 7, 2011.[6] At the trial, the Family Court heard testimony from 18 different witnesses, including Stewart, Taylor, Denise Lewis, Officer Smithhart, and the two treating paramedics, Carl Haggerty and Glen Marshall. Wright, who also testified, denied elbowing Stewart in the eye, but admitted that he had hit Taylor with his fist. Wright claimed that (i) he was acting in self-defense, because Taylor had first grabbed his (Wright's) arm,[7] and (ii) where someone tries to hit him, it was "instinct" for him to strike first.[8]

Other witnesses presented conflicting accounts as to who—Taylor or Wright—had acted first. Stewart and Taylor both testified that Wright punched Taylor without provocation. The defense presented the testimony of other witnesses, who were either friends or acquaintances of Wright.[9] Those witnesses testified that they "clearly" saw Taylor "lunge" at Wright and grab his arm before Wright reacted by punching Taylor. None of them, however, were close enough to hear the words exchanged between Taylor and Wright, and at least one could not hear any raised voices. On rebuttal, the State presented pictures, measurements, and diagrams to counter the defense witnesses' testimony that they "clearly" saw the encounter from where they were standing.

After hearing the evidence, the Family Court found that Wright failed to show that he had acted in self-defense, and that

---

6. Initially, the second trial day was scheduled for December 16, 2010. The record shows that the case was continued on December 8, 2010, and trial resumed on February 7, 2011.

7. Wright testified as follows:

> [Taylor] was jumping and nudging at me [like he was going to fight] and then he went to grab me and I jumped back and that's when I hit him.... I felt one hand grab me ... [and] I thought he was grabbing me and going to punch me so that's why I leaned back ... [a]nd then that's

> when I came forward and I hit him.... I didn't think oh, run away, run away. I thought [Taylor] was going to hit me again so I hit him before he hit me.

8. Specifically, Wright stated, "I've been in three or four [fights with] bullies and it's just instinct that when somebody tries to hit me, to hit them first."

9. The witnesses testifying on behalf of Wright were seven of his friends, and a friend of Wright's mother.

Wright had acted recklessly by punching Taylor in the head, thereby causing him serious physical injury. Accordingly, the trial court found Wright delinquent of first-degree assault, first-degree reckless endangering, and offensive touching (against Stewart). The court sentenced Wright to an indeterminate commitment to Level V Ferris School (or equivalent), and to remain under the jurisdiction of the Family Court until he turned 19 years of age. Wright directly appeals.

## ANALYSIS

On appeal, Wright raises two claims of error. First, he claims that there was insufficient evidence for the Family Court to find him delinquent of first-degree assault, first-degree reckless endangering, and offensive touching. Second, he argues that the Family Court made two erroneous evidentiary rulings by: (a) permitting the State to present rebuttal evidence that had not been offered in its case-in-chief and that had not been produced to defense counsel before the second day of trial; and (b) excluding evidence of Taylor's violent past, which was argued to be relevant to Wright's claim of self-defense. We address those claims in that order.

### I. The Sufficiency of Evidence Claim

■ Wright first claims that there was insufficient evidence to support the Family Court's three delinquency findings.

Wright has not, however, identified which of those three findings he is challenging. Nor has he identified a specific element of any of the three offenses for which he claims to have been improperly found delinquent. Instead, Wright makes the broad brush argument that the Family Court "made no allowance for the testimony of the [defense] witnesses, no reconciliation of the conflicts in the testimony of [Taylor] and [Stewart], and no attempt to determine if indeed [Wright] was justified in using force for the purpose of self-defense."

■ Generally, we review a sufficiency of evidence claim *de novo* to determine "whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could find a defendant guilty beyond a reasonable doubt."[10] In doing that, we defer to the trier of fact's factual findings, resolution of witness credibility, and drawing of inferences from proven facts.[11] Here, however, Wright failed to present his sufficiency-of-the-evidence claim to the trial court on a motion for directed verdict or for judgment of acquittal notwithstanding the verdict. Therefore, we review his claim for plain error.[12]

■ We find no plain error. There was sufficient evidence to support the Family Court's finding of delinquency on all three charges. After hearing conflicting accounts about whether Taylor or Wright

10. *Farmer v. State*, 844 A.2d 297, 300 (Del. 2004) (internal quotation marks, alteration marks, and citation omitted).

11. *Morgan v. State*, 922 A.2d 395, 400 (Del. 2007) ("Our appellate function is deferential, because the jury is the sole trier of fact responsible for determining witness credibility, resolving conflicts in testimony and for drawing any inferences from the proven facts." (internal quotation marks and citation omitted)).

12. *Swan v. State*, 820 A.2d 342, 358 (Del. 2003) ("In the absence of a motion for directed verdict or for judgment of acquittal notwithstanding the verdict, this Court reviews claims of insufficient evidence for plain error."); *Gordon v. State*, 604 A.2d 1367, 1368 (Del.1992) (declining to consider defendant's insufficient evidence claim where defendant had "failed to present this issue to the court in this jury trial, making no motion for directed verdict, or for judgment of acquittal notwithstanding the verdict.").

struck first, the trial judge made a credibility determination, and credited the testimony of Taylor, Stewart, and Lewis over that of Wright and his acquaintances. The trial court found that "[a]s [Wright] reached [Taylor], who had then come into the middle of the street where [Wright] and [Stewart] were, [Wright] struck [Taylor] on the left side of the head in the temple area." The trial court also found that "[t]he testimony in this case establishes that [Wright] pushed or struck [Stewart] prior to striking [Taylor]." As the trier of fact and the sole judge of witness credibility, it was for the trial judge to decide to reject Wright's testimony and to accept the contrary testimony of Taylor and Stewart.[13]

Regarding Wright's claim of self-defense, the trial judge noted that the essential element of that claim requires Wright to have had a "subjective belief" that the force used he against Taylor "[was] immediately necessary for the purpose of protecting [himself]" from Taylor's use of unlawful force. The court found, however, that Wright had failed to produce "credible evidence" that he subjectively believed that punching Taylor in the head was immediately necessary. The trial judge was "satisfied based on the evidence in this case that [Wright] has failed to provide such credible evidence to support the self-defense issue." As the trier of fact, it was for the trial judge to determine whether Wright's testimony and claim of self-defense were credible.[14] Accordingly, the

Family Court did not err by discounting the testimony of Wright and his acquaintances, and rejecting Wright's claim of self-defense.

## II. The Evidentiary Claims

Wright next claims that the Family Court made two erroneous evidentiary rulings. First, he argues that the trial court should have excluded the State's rebuttal evidence, offered to counter the defense witnesses' eyewitness testimony, because that evidence had not been produced to defense counsel before the second day of trial. Second, Wright contends that the trial court erroneously denied his motion to re-open the defense case to admit evidence of Taylor's prior convictions for aggravated menacing and terroristic threatening, because that evidence would have been probative of his self-defense claim.

■■■■ We review a trial court's decision to admit or deny evidence for abuse of discretion.[15] "An abuse of discretion occurs when a court has exceeded the bounds of reason in view of the circumstances, or so ignored recognized rules of law or practice to produce injustice."[16] To the extent the admissibility of evidence rests on a question of law, we review that claim *de novo*.[17] In that context, the Court "carefully review[s] the record to determine whether competent evidence supports the [trial] court's findings of fact and whether its conclusions of law are not erroneous."[18]

13. *Farmer*, 844 A.2d at 300.

14. *Id.*

15. *Longfellow v. State*, 688 A.2d 1370, 1372 (Del.1997).

16. *Floudiotis v. State*, 726 A.2d 1196, 1202 (Del.1999) (internal quotation and alteration marks omitted).

17. *Gattis v. State*, 955 A.2d 1276, 1281 (Del. 2008).

18. *MacDonald v. State*, 778 A.2d 1064, 1071 (Del.2001) (internal quotation marks and citation omitted); *Simonsen v. State*, 542 A.2d 1215 (Table), 1988 WL 61567, at *1 (Del. 1988) ("The standard and scope of review for analyzing the admissibility of [a defendant's] confession is whether the trial judge properly applied the law to the facts, whether the trial

## A. The State's Rebuttal Evidence

 Wright first claims that the Family Court abused its discretion by permitting the State to present, during its rebuttal, "new pictures, measurements and diagrams that had not been produced to the defense" before the second day of trial. He argues that the State created this "new" evidence to counter the defense's eyewitness testimony, and that under Family Court Criminal Procedure Rule 16(f),[19] the State had a continuing discovery obligation to produce that evidence. Because the State failed to comply with that discovery obligation, Wright insists, that evidence should have been excluded.

 Where a trial court determines that the State has committed a discovery violation, that court "has broad discretion to fashion the appropriate sanction...."[20] We review a trial court's determination of whether a discovery violation has occurred for an abuse of discretion,[21] and "will reverse a trial judge's ruling only if the substantial rights of the accused are prejudicially affected."[22] In conducting that review, we apply a three-part inquiry that includes: "(1) the centrality of the error to the case; (2) the closeness of the case; and (3) the steps taken to mitigate the results of the error."[23] Where there has been no discovery violation, however, the Court need not engage in that three-part analysis.[24]

Family Court Criminal Procedure Rule 16(f) provides that:

> If, subsequent to disposition of a motion filed under this Rule, and prior to or during trial, a party discovers additional material previously requested, or falling within the scope of an order previously entered, which is subject to discovery or inspection under the Rule, the party shall promptly notify the other party or counsel or the Court of the existence of the additional material. If at any time during the course of the proceedings it is brought to the attention of the Court that a party has failed to comply with this Rule or with an order issued pursuant to this Rule, the Court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence material not disclosed, or it may enter such other order as it deems just under the circumstances.[25]

In this case there was a three-month interval between the first and second days of trial, December 6, 2010 and February 7, 2011, respectively. During that interval, Officer Smithhart measured the distances between where the altercation actually occurred, and where the defense witnesses testified they were standing when they witnessed the episode. Smithhart also photographed the crime scene from the position where each defense witness testi-

judge's factual findings were supported by competent evidence, and whether the trial judge abused his discretion in making this evidentiary ruling.")

19. Del.Fam. Ct. Cr. R. 16(f).

20. *Cabrera v. State*, 840 A.2d 1256, 1263 (Del. 2004).

21. *Hopkins v. State*, 893 A.2d 922, 927 (Del. 2006).

22. *Id.* at 926 (internal quotation marks omitted).

23. *Id.* at 927.

24. *Id.*

25. Del.Fam. Ct. Cr. R. 16(f).

fied he or she had witnessed the altercation between Wright and Taylor.

The Family Court did not abuse its discretion in finding that no discovery violation had occurred and in admitting the disputed evidence. The purpose of the measurements, maps, and photographs was to refute the defense witnesses' trial claims that they had a clear view of the altercation from the places where they were standing. The Family Court properly concluded that the measurements, maps, and photographs constituted valid rebuttal evidence.[26] Specifically, the trial judge found that the "new" evidence "shouldn't be a surprise because your witnesses would have known where they were." Nor was that evidence a "correction" to the State's case-in-chief, because the State was merely "showing where the witnesses of [Wright] were when they testified." Even so, the trial judge repeatedly stated that he would "give [the rebuttal evidence] what weight I deem appropriate," and that he "may not give [the evidence] any weight."

Nor is there any basis to conclude that the State intentionally withheld its newly-generated rebuttal evidence. The record shows that Officer Smithhart did not take the photographs of the different viewing angles and measure the distances between the crime scene and the witnesses' locations until the last week in January. The State did not receive the police photographs until Friday, February 4, 2011, three days before the trial resumed on Monday, February 7, 2011. The State's diagrams and measurements were created that weekend, for immediate use at the Monday trial. Upon being informed of this "new" evidence, Wright did not seek

relief by requesting a continuance to address, or to further inspect, the new court exhibits, as he was entitled to do under Rule 16(f).

Wright claims that his defense counsel "was completely unable to properly prepare to cross-examine, rebut or otherwise successful[ly] challenge this late-attack on the credibility of the eye witnesses." This argument is not supported by the record. A review of the trial transcript discloses that defense counsel cross-examined Officer Smithhart regarding what type of camera and lens magnification he used to take the photographs, as well as the accuracy of Smithhart's identification of where the altercation took place. Defense counsel also questioned Smithhart about the accuracy and reliability of the recorded distance measurements, and the trial judge independently questioned Smithhart about the photographs. On this record, Wright has failed to show that he was prejudiced by the State's "new" rebuttal evidence.

We conclude, for these reasons, the trial judge properly exercised his discretion in not excluding the State's rebuttal evidence. Even if (*arguendo*) the State was obligated to turn over its rebuttal evidence under Rule 16(f), Wright cannot show any prejudice, because: (i) he could have sought a continuance to investigate further the rebuttal evidence, but failed to do so; and (ii) the trial judge heard and considered all legal and factual arguments, including Wright's counsel's cross-examination on the issue of whether Officer Smithhart's photographs, maps, and measurements were accurate and reliable.

## B. *Taylor's "Violent Past" Evidence*

██ Wright's final claim is that the Family Court abused its discretion by de-

26. *See United States v. Stitt,* 250 F.3d 878, 897 (4th Cir.2001) (stating that "[r]ebuttal evidence is defined as evidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party. That which tends to explain or contradict or disprove evidence offered by the adverse party." (internal quotation and alteration marks omitted)).

nying his motion to re-open the defense case to admit evidence of Taylor's prior convictions for aggravated menacing and terroristic threatening. Wright argues that evidence of Taylor's "violent past" was relevant to his claim of self-defense (or justification) and, therefore, that evidence should have been admissible.

■■■ As a general matter, a victim's character is not an essential element of a self-defense claim.[27] For that reason, Delaware Rules of Evidence 405(b) provides that specific instances of a victim's past conduct are generally inadmissible to show that the victim had a propensity for violence.[28] Despite that general prohibition, evidence of a victim's prior bad acts may be admissible to support a claim of self-defense where the defendant had actual knowledge of the victim's prior bad acts.[29] As we explained in *Tice v. State*:

> Since one of the factors that influences the reasonable belief of a defendant, threatened with imminent assault, is the defendant's *knowledge or awareness* of the victim's past acts of violence, these instances are relevant for their proper noncharacter purpose. Subject to the satisfaction of the requirements articulated in *Getz* [*v. State*[30]], the defense was entitled to use this evidence under [Delaware Rules of Evidence] 404(b) to show the fear experienced by the defendant, and thus, establish the *subjective*

state of mind required to assert the claim of self-defense.[31]

The Family Court properly denied Wright's motion to admit evidence of Taylor's "violent past," because Wright failed to show that he had a "subjective belief" that Taylor had a history of violent conduct. Wright testified that he punched Taylor because Taylor had swung first, not because he (Wright) feared Taylor or knew that Taylor was violent.[32] Wright also admitted that he had no actual knowledge of Taylor's involvement in the aggravated menacing and terroristic threatening offenses, or of whether Taylor had a reputation for violence. Therefore, Taylor's history could not have influenced Wright's subjective state of mind when he punched Taylor, because Wright was ignorant of that history at that time. The Family Court did not abuse its discretion in denying Wright's request to admit evidence of Taylor's two convictions, because there was no basis to admit that evidence as probative of Wright's claim of self-defense.

## CONCLUSION

For the foregoing reasons, the judgments of the Family Court are affirmed.

27. *Tice v. State*, 624 A.2d 399, 400 (Del.1993) ("We conclude that the character of the victim is not an essential element of a self-defense claim.").

28. *Id.* at 402 (explaining that "specific instances of past conduct cannot be used as circumstantial evidence of a victim's character for violence or aggression under [Delaware Rules of Evidence] 405(b).").

29. *Id.*

30. *Getz v. State*, 538 A.2d 726 (Del.1988).

31. *Tice*, 624 A.2d at 402 (emphasis added).

32. Taylor was arrested for aggravated menacing and terroristic threatening on August 5, 2010, and pled guilty to those charges on January 14, 2011. Therefore, although Taylor's arrest occurred before the September 23, 2010 alteration between Wright and him, Taylor did not plead guilty to those offenses until after he and Wright testified on the first day of trial on December 6, 2010.