IN THE SUPREME COURT OF THE STATE OF DELAWARE

SHANNON HARRIS, §
§ No. 664, 2013
Defendant Below, §
Appellant, § Court Below–Superior Court
§ of the State of Delaware in
v. § and for New Castle County
§
STATE OF DELAWARE, §
§
Plaintiff Below, § Cr. ID No. 0508015411
Appellee. §

Submitted: May 28, 2014
Decided: August 7, 2014

Before **STRINE,** Chief Justice, **BERGER** and **RIDGELY,** Justices.

### O R D E R

This 7th day of August 2014, upon consideration of the appellant's brief under Supreme Court Rule 26(c), his attorney's motion to withdraw, and the State's response, it appears to the Court that:

(1) On August 17, 2005, the police arrested Roderick Butler and the appellant, Shannon Harris, in connection with a robbery early that morning in New Castle, Delaware. In the indictment that followed, Harris and Butler were charged with Robbery in the First Degree, Attempted Burglary in the First Degree, Reckless Endangering in the First Degree, Criminal Mischief, and several weapon offenses. In February 2007, Harris and Butler were jointly tried before a Superior Court jury.

(2) Harris and Butler attended only the first two days of the three-day trial. Midway through the third day of trial and before the jury rendered its verdict, both men voluntarily left the courthouse and did not return. Harris was convicted *in absentia* of Attempted Burglary in the First Degree, Reckless Endangering in the First Degree, Criminal Mischief, and three weapon offenses and was acquitted of the remaining counts in the indictment. Butler was convicted *in absentia* of one weapon offense and was otherwise acquitted.

(3) Butler was apprehended in March 2007 and was sentenced in August 2008.[1] On direct appeal, the Court affirmed the Superior Court judgment.[2] Harris was apprehended in April 2013 and was sentenced in November 2013 to a total of twenty-nine years at Level V, suspended after twenty-one years, for Level III probation. This is Harris' direct appeal from his conviction and sentencing.

(4) On appeal, Harris' appellate counsel ("Counsel")[3] has filed a brief and a motion to withdraw under Supreme Court Rule 26(c) ("Rule 26(c)") asserting that there are no arguably appealable issues. Harris,

---

[1] *See Butler v. State*, 2009 WL 1387640, at *1 (Del. May 19, 2009) (summarizing proceedings).

[2] *Id.*

[3] Harris was represented by a different counsel at trial.

2

through Counsel, has submitted several points for the Court's consideration. The State has responded to Harris' points and has moved to affirm the Superior Court judgment.

(5)    When reviewing a motion to withdraw and an accompanying brief under Rule 26(c), the Court must be satisfied that the appellant's counsel has made a conscientious examination of the record and the law for arguable claims.[4]  The Court must also conduct its own review of the record and determine whether the appeal is so totally devoid of at least arguably appealable issues that it can be decided without an adversary presentation.[5]

(6)    The State's first witness, Oliver Cephas, testified that on August 17, 2005 at approximately 1:00 a.m., he was walking in Rosegate, a residential area of New Castle, when he was accosted by two men, one with a gun.  The man with the gun ordered Cephas to get on the ground and empty his pockets.  Cephas handed over a cell phone.  The man with the gun took the phone, threw it on the ground, and ordered Cephas to get up and walk to a nearby residence.  When the man with the gun began kicking the front door of the residence, Cephas ran and hid behind a nearby parked car. Moments later, Cephas heard gunshots and was nearly struck by gunfire as

---

[4] *Penson v. Ohio*, 488 U.S. 75, 83 (1988); *McCoy v. Court of Appeals of Wisconsin*, 486 U.S. 429, 442 (1988); *Anders v. California*, 386 U.S. 738, 744 (1967).

[5] *Id.*

the two men who had accosted him fled the scene. Cephas could not identify his assailants at trial.

(7) Another witness for the State, Donald Gordy, testified that at approximately 1:00 a.m. on August 17, 2005, he was heading south on New Castle Avenue when his car broke down. Gordy pulled into Rosegate, where the light was better, to work on his car. As he was working on his car, Gordy noticed two men walk past him. Moments later, Gordy heard gunshots and saw the same two men run back past him. Gordy testified that the shorter of the two men was wearing a white tee shirt and had a gun. Gordy could not identify the men at trial.

(8) A third witness for the State, Darrell Little, testified that between 1:30 and 2:00 a.m. on August 17, 2005, he was looking out of the front doorway of his home in Rosegate when he saw his cousin, Cephas, walking down the street. Little struck up a conversation with Cephas. As the two men were chatting, Little saw a person suddenly appear next to Cephas and then Cephas drop to the ground. Little also noticed another person in the bushes by his patio. Alarmed, Little shut the front door and was heading toward his backyard to get his dog when the front door was kicked open. From his backyard, Little heard a total of eight or nine

4

gunshots. Little could not identify the person or persons who attempted the break-in.

(9)     As part of the investigation into the events of August 17, 2005, the police recovered a .380 handgun, live ammunition, and a spent .380 shell casing from the front room of Little's home. Little denied exchanging gunfire with the assailants.

(10)   Several police officers in the Rosegate area heard the gunshots and immediately responded to the scene. One of the responding officers, Detective Edward J. Sebastianelli, testified that as he was driving south on Route 9, he saw two black males, both with handguns, running from Rosegate toward a tan minivan parked on the shoulder of Route 9. One man, dressed in dark clothing, went around the front of the van and out of sight. The other man, dressed in a light-colored tee shirt, got in the van and pulled off, making a right turn into a development. Det. Sebastianelli followed the van to the end of the street where the van stopped. From his police car, Det. Sebastianelli watched as the man in the light-colored tee shirt got out of the van and jogged into a wooded area. Later that day, Det. Sebastianelli located the man in the light-colored tee shirt at Christiana Hospital, where the man was being treated for a gunshot wound. The man was identified as Harris.

5

(11)　Officer Christopher Sarnecky testified that at approximately 4:30 p.m. on August 17, 2005, he retrieved a nine-millimeter handgun from the backyard of a New Castle residence after a citizen, Melody King Thomas, called to report that her child had found the gun in a grassy area behind her house. At trial, a forensic analyst testified that blood on the gun was found to match Harris', and a firearms and toolmarks examiner testified that seven of the thirteen shell casings recovered at the scene of the robbery/break-in were determined to have been fired from the gun.

(12)　On the second day of trial, Harris' defense counsel sought to introduce the results of a preliminary gunshot residue ("PGSR") test that was performed on Harris when he was taken into custody on August 17, 2005. The State objected to the proffered evidence on the basis that the police had, in the interim, stopped using the PGSR test after determining that the test was unreliable. The Superior Court ruled that, before moving the test results into evidence, defense counsel would have to lay a foundation that the PGSR test was reliable.

(13)　In an attempt to lay the foundation for the reliability of the PGSR test, defense counsel conducted a *voir dire* of Detective Anthony Dinardo of the New Castle County Police Evidence Detection Unit. Det. Dinardo testified that the New Castle County Police had discontinued using

6

the PGSR test, also called an "instant-shooter test," because the test had "been shown to be fairly unreliable – false positives, false negatives, whatever."[6]  Based on Det. Dinardo's testimony, the Superior Court ruled that defense counsel had not laid a sufficient foundation for the reliability of the PGSR test and did not admit the test results.

(14)   In his first point on appeal, Harris contends that the Superior Court's exclusion of the PGSR test results deprived him of a fair trial. The Court reviews the admission or exclusion of evidence for an abuse of discretion.[7]

(15)   In this case, the Superior Court did not abuse its discretion in excluding the proffered PGSR test results.  Harris, as the proponent of the test results, had the burden to establish a sufficient foundation for the reliability of the underlying test.[8]  The only testimony Harris proffered in support of the PGSR test described the test as unreliable.

(16)   In his second point on appeal, Harris contends that Officer Sarnecky's testimony about the phone call from Ms. Thomas was impermissible hearsay.  Because Harris' claim could have been raised at trial

---

[6] Trial Tr. at 143 (Feb. 8, 2007).

[7] *Wright v. State*, 25 A.3d 747, 752 (Del. 2011).

[8] *Sturgis v. Bayside Health Ass'n Charter*, 942 A.2d 579, 584 (Del. 2007).

7

and was not, the Court has reviewed the claim for "plain error."[9] Plain error is error that is "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[10]

(17) The Court has found no plain error arising from Officer Sarnecky's testimony recounting Ms. Thomas' phone call. In a criminal case, under appropriate circumstances, a police officer's testimony recounting an out-of-court third-party phone call is properly admitted to explain the police officer's action.[11] In this case, Officer Sarnecky's recounting of Thomas' phone call explained what led to his retrieval of the gun and was not specific to Harris.[12]

(18) In his third point on appeal, which was also not raised at trial, Harris challenges the forensic analyst's testimony and report summarizing the results of the DNA comparison performed on the blood swabbed from the gun and a sample of Harris' blood.[13] According to Harris, "the statistical

[9] Del. Supr. Ct. R. 8.

[10] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986) (citations omitted).

[11] *Johnson v. State*, 587 A.2d 444, 451 (Del. 1991).

[12] *See Kanda v. State*, 2012 WL 4862590, at *2 (Del. Oct. 12, 2012) (citing *VanArsdall v. State*, 524 A.2d 3, 11 (Del. 1987)).

[13] The forensic analyst testified from the report that "[t]he probability of randomly selecting an unrelated individual with the DNA profile matching that of the two samples is . . . 1 in 1.477 trillion for the African-American population." Trial Tr. at 43 (Feb. 8, 2007).

probabilities or frequencies of DNA with like characteristics being found in the population have not been demonstrated to be reliable."

(19) In *Nelson v. State*, we held that "DNA matching evidence is inadmissible in the absence of a statistical interpretation of the significance of the declared match."[14] Under *Nelson v. State*, Harris' claim that "the statistical probabilities or frequencies of DNA . . . have not been demonstrated to be reliable" is simply without merit.

(20) In his remaining points on appeal, Harris alleges numerous instances of prosecutorial misconduct in the prosecutor's opening and closing statements. Because Harris did not object to the asserted prosecutorial misconduct at trial, and the trial judge did not intervene *sua sponte*, we have reviewed the alleged misconduct for plain error.[15]

(21) Harris alleges that the prosecutor committed misconduct when he did not call Ms. Thomas as a witness after he told the jury in the State's opening statement that they would "meet a woman" who "would come in and tell" them that her child had found a gun. In an attempt to demonstrate the prosecutor's bad faith, Harris contends that the prosecutor's failure to

---

[14] *Nelson v. State*, 628 A.2d 69, 75 (Del. 1993).

[15] *See Williams v. State*, 2014 WL 2803068, at *1 (Del. June 17, 2014) (citing *Torres v. State*, 979 A.2d 1087, 1093-94 (Del. 2009)).

issue a subpoena assuring Thomas' appearance at trial suggests that he did not intend to call Thomas as a witness.

> (22)  In his opening statement the prosecutor should confine his remarks to evidence he intends to offer which he believes in good faith will be available and admissible, and a brief statement of the issues in the case. It is unprofessional conduct to allude to any evidence unless there is a good faith and reasonable basis for believing that such evidence will be tendered and admitted into evidence.[16]

(23)  In this case, assuming that the prosecutor erred when he did not call Ms. Thomas as a witness after telling the jury in his opening statement that they would meet and hear from her, we conclude that the error was not "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[17]  Because Officer Sarnecky testified about where he found the gun, it seems probable that the prosecutor came to believe that Thomas' testimony regarding her discovery of the gun added little to justify the additional trial time.  Moreover, precisely because Thomas' additional testimony would have been largely cumulative, the failure of her to testify presented no substantial prejudice to Harris.

---

[16] *Hughes v. State*, 437 A.2d 559, 566-67 (Del. 1981) (citing ABA Standards, the Prosecution and Defense Functions § 5.5 (Approved Draft, 1971)).

[17] *Wainwright v. State*, 504 A.2d at 1100. *See Williams v. State*, 2014 WL 2803068, at*1 (Del. June 17, 2014) (citing *Baker v. State*, 906 A.2d 139, 150 (Del. 2006)).

(24)  Harris' remaining claims of prosecutorial misconduct concern comments made by the prosecutor in the State's closing statement.  Having reviewed the litany of comments that Harris now finds objectionable, even if we assume that that the prosecutor's comments on the DNA evidence were improper hyperbole because they involved his own estimate of the odds of winning a lottery,[18] we would conclude that those comments were not "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[19]  The balance of the prosecutor's closing statement properly argued legitimate inferences of [Harris'] guilt adduced from the evidence and did not imply that the prosecutor had "personal superior knowledge, beyond what [was] logically inferred from the evidence at trial."[20]

(25)  The Court concludes that Harris' appeal is wholly without merit and devoid of any arguably appealable issue.  We are satisfied that Counsel made a conscientious effort to examine the record and the law and properly determined that Harris could not raise a meritorious claim on appeal.

---

[18] When commenting on the DNA evidence in his closing statement, the prosecutor said: "[C]oincidentally, it's got, essentially, his DNA, a one in 4.3 billion chance.  Anybody play the Power Ball?  What is the Power Ball?  One in 93,000,000.  That's the odds it's his blood."  Trial Tr. at 55-56 (Feb. 12, 2007).

[19] *Wainwright v. State*, 504 A.2d at 1100.  *See Williams v. State*, 2014 WL 2803068, at *1 (Del. June 17, 2014) (citing *Baker v. State*, 906 A.2d 139, 150 (Del. 2006)).

[20] *Burns v. State*, 76 A.3d 780, 789-90 (Del. 2013) (citations omitted).

11

NOW, THEREFORE, IT IS ORDERED that the State's motion to affirm is GRANTED. The judgment of the Superior Court is AFFIRMED. The motion to withdraw is moot.

BY THE COURT:

/s/ Henry duPont Ridgely
Justice