IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DAI'YANN WHARTON, | § | |
| | § | |
| | § | |
| Defendant-Below, | § | No. 548, 2019 |
| Appellant, | § | |
| | § | |
| | § | |
| v. | § | Court Below:  Superior Court |
| | § | of the State of Delaware |
| | § | |
| | § | |
| STATE OF DELAWARE, | § | |
| | § | C.A. No.  1705016524 A&B |
| | § | |
| Plaintiff-Below, | § | |
| Appellee. | § | |
| | § | |

Submitted:   November 4, 2020
Decided:       January 19, 2021


Before **VALIHURA**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Superior Court.  **AFFIRMED.**

Elise K. Wolpert, Esquire (*argued*), Eugene J. Maurer, Jr., Esquire, Wilmington, Delaware, for Appellant.

Andrew J. Vella, Esquire (*argued*), Delaware Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

In a bench trial beginning on June 19, 2019, the Superior Court found Dai'yann Wharton guilty of several charges, led by a count of Murder in the First Degree for the slaying of Yaseem Powell. Wharton seeks reversal of his conviction because the State identified a group of highly incriminating text messages less than two weeks prior to trial, though the messages themselves had been contained in a digital discovery disclosure made by the State to Wharton more than a year earlier.

Because of the State's earlier disclosure, and because we reject Wharton's assertions that the State engaged in any discovery violations or other misconduct, we hold that the Superior Court was within its discretion to deny Wharton's motion to exclude the text messages. Accordingly, we AFFIRM the Superior Court's conviction and judgment of sentence.

## I. Statement of Facts

Shortly after 4:00 p.m. on March 28, 2017, Officer Brenda Merced of the Wilmington Police Department responded to reports of a shooting in the Riverside neighborhood of Wilmington.[1] Within minutes of the call, Officer Merced arrived on the scene, and found Yaseem Powell wounded on the ground. Officer Merced immediately

---

[1] App. to Op Br. at A154 (Testimony of Officer Brenda Merced).

2

began performing first aid.[2] While she did so, Powell's cell phone fell out of his pocket.[3] Powell later died of a gunshot to his head.[4]

Police investigators subsequently recovered shell casings 175 feet away from where Powell lay.[5] They also recovered the contents of Powell's cell phone.[6] Shortly before the shooting, Powell communicated with an associate on a cell phone app that he was walking behind Dai'yann Wharton and Benjamin Smith.[7] Surveillance footage showed instead that Powell was being followed rather than following others.[8]

Hours later, Andrew Ervin was shot in the foot on Heald Street.[9] While hospitalized, Ervin told police he was the victim of an armed robbery.[10] Ervin asserted that a firearm recovered at the site of his shooting belonged to one of the robbers whom Ervin had disarmed.[11] Ballistic evidence showed the recovered weapon had fired the shell casings recovered near the Powell murder.[12]

---

[2] *Id.* at A155.

[3] *Id.*

[4] *Id.* at A167 (Testimony of Detective MacKenzie Kirlin).

[5] *Id.* at A177 (Testimony of Detective Hugh Stephey).

[6] *Id.* at A166 (Testimony of Detective MacKenzie Kirlin).

[7] *Id.* at A220 (Testimony of Detective Robert Fox).

[8] *Id.* at A230–31.

[9] *Id.* at A156–57, 161 (Testimony of Andrew Ervin).

[10] *Id.* at A162. Although Ervin was an uncooperative witness and denied almost all memory of the events surrounding the shooting, he confirmed the authenticity of a video recording of his conversation with police. *Id.*

[11] *Id.*

[12] *Id.* at A173 (Testimony of Detective MacKenzie Kirlin); A204 (Testimony of Robert Freese).

According to Smith, he and Wharton were members of the gang "Shoot to Kill" ("STK"), which formed after the murder of Smith's friend Jordan Ellerby in 2015.[13] The gang's purpose was to obtain revenge against another gang, Only My Brothers ("OMB"), for that killing.[14] Smith claims he and Wharton waited outside of the Job Corps building for Powell to finish work, intending to shoot him.[15] Smith asserts that Wharton shot Powell with Smith's pistol, then returned the weapon. Smith further recounts that he was with Ervin when Ervin was shot in the foot a few hours later. Smith described the shooting as a reprisal attack for the Powell slaying, and claims he gave his gun to Ervin before they stepped outside and were attacked. According to Smith, Ervin created the story of being robbed while alone and disarming one of his assailants to disguise Smith's ownership of and connection to the firearm.[16]

Hours after Powell's death and Ervin's shooting, Isaiah Baird and Wharton communicated ("Incriminating Messages") through a cell phone messaging app.[17] In the first part of this conversation, the two discuss Ervin's shooting.[18] Baird told Wharton that

---

[13] *Id*. at A233 (Testimony of Benjamin Smith). Smith testified pursuant to a plea agreement for which he received a five-year sentence for manslaughter and conspiracy for his actions in relation to Powell's death. *Id*. at A244–45.

[14] *Id*. at A233–34.

[15] *Id*. at A239.

[16] *Id*. at A244.

[17] *Id*. at A109–13 (Cell Phone Extraction). The Incriminating Messages begin at 4:45 a.m. EDT on March 29, 2017 and are between a user "isaiahbaird0@gmail.com" and "Self." "Self Made" is Wharton's name on social media. *Id*. at A236 (Testimony of Benjamin Smith).

[18] *Id*. at A217–18 (Testimony of Detective Robert Fox); *see also id.* at A109 (Cell Phone Extraction):

"isaiahbaird0@gmail.com":   Bro they shot twin

4

Ervin had been shot, and that police had recovered a weapon that Ervin had dropped.[19] Wharton expressed apprehension because that weapon had been used to murder someone[20] and asked Baird, speaking of the attack on Ervin, if "U think it cus I hit there folks??"[21]

Two days later, the conversation continued and Wharton discussed with Baird that a third individual, Aubrey, was telling people that "I killed boul."[22] When Baird asked why Wharton told Aubrey, Wharton asserted "I didn't tell him shit."[23] When Baird asked how Aubrey knew, Wharton explained "before I did it we was all out [in] front of Twin crib [Ervin's home]."[24]

---

"Self": I know

Ervin has a twin sibling, *Id*. at A159 (Testimony of Andrew Ervin), and is nicknamed Twin. *Id*. at A238 (Testimony of Benjamin Smith).

[19] *Id*. at A217 (Testimony of Detective Robert Fox); *see also id.* at A109 (Cell Phone Extraction):

"Self": How 12 get the pole?
"isaiahbaird0@gmail.com": Twin dropped it.
"Self": Omg.

"Twelve" is a slang term for the police. *Id*. at A217 (Testimony of Detective Robert Fox). "Pole" is a common term for a firearm. *Id*.

[20] *See id.* at A109–110 (Cell Phone Extraction):

"Self": How and it's already a body on it tf
"isaiahbaird0@gmail.com": Idk bro facts
"Self": I'm scar dawg
"isaiahbaird0@gmail.com": Bro just be cool you going be straight.

[21] *Id*. at A110.

[22] *Id*. at A218 (Testimony of Detective Robert Fox); A110–11 (Cell Phone Extraction) (containing the timestamps of the messages and showing the two-day gap between them). According to a police detective, "Boul," also spelled "Bull" or "Bul" is a slang term akin to "dude" or "guy." *Id*. at A218 (Testimony of Detective Robert Fox); *see also id.* at 245 (Testimony of Benjamin Smith) ("It's referring to somebody, anybody.").

[23] *Id*.

[24] *Id*. at A218 (alteration added).

5

## II.    *Procedural History*

A grand jury indicted Wharton on May 30, 2017.[25]  On January 14, 2018, the State produced discovery material to Wharton and his then-codefendants on a USB flash drive.[26] Included in the materials produced were cell phone extractions from Wharton and Baird, and two other individuals.[27]   The parties agree that this production included the Incriminating Messages.[28]

In response to a supplemental discovery request from Wharton, on May 1, 2018 the State informed Wharton that at that time it "[did] not intend to present any evidence obtained from the cellular extraction of Dia'yann Wharton's cellular telephone."[29]  On May 18, 2018, Wharton followed up with a motion under Superior Court Criminal Rule 16(a)(C) requesting that the State identify with specificity what from the voluminous material conveyed in discovery it intended to use.[30]  At an office conference on the motion four days later, the State described its discovery production as being intentionally over-inclusive, as it was erring on the side of disclosure out of respect for the defendant's rights:

> "There's a mountain of stuff we provided.  I don't want to call it all evidence because 85 percent of it I don't intend to use at this time. Sometimes circumstances change that makes something relevant that wasn't. But 85 percent of the information I provided was out of an abundance of caution.  I don't know if there's something in the cell phone downloads that

---

[25] *Id*. at A1 (Superior Court Criminal Docket).

[26] *Id*. at A39 (January 2018 Discovery Letter).

[27] *Id*. at A42.

[28] *Id*. at A140–41 (Motion *in Limine* Hearing).

[29] *Id*. at A43 (May 2018 Discovery Letter).

[30] *Id*. at A47–49 (Motion *in Limine* to Exclude Certain Evidence).

6

defense counsel may find that they think it's helpful to their case and someone may characterize as *Brady* evidence down the road.

If I find *Brady* evidence, I'm alerting them proactively. If I see helpful evidence that I'm going to present at trial, I will proactively alert them. But as to all the other stuff, certain aspects of the case where what is or is not *Brady* is in the in the eye of the beholder, I guess. So 85 percent of what I've provided is not going to be part of the State's case in chief. I can identify all of that stuff versus what will be in a State's case in chief."[31]

At that conference, the Court instructed the State to "sit down with each of the defense counsel," and "turn over what the relevant cell phone text messages and calls are."[32] At the subsequent meetings the State did not identify the Incriminating Messages to Wharton or his codefendants, and in a letter on May 15, 2019 indicated that "*Information obtained from the cellular extractions of Defendants' phones will not be used during the Powell Case*."[33]

On June 5, 2019, the State brought the first part of the Incriminating Messages to Wharton's attention.[34] The State only became aware of them the previous day. Wharton

---

[31] *Id*. at A57–58 (Rule 16(a)(C) Office Conference, May 22, 2018); *cf. Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97, 10 L. Ed. 2d 215 (1963) ("suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

[32] *Id*. at A91 (Rule 16(a)(C) Office Conference, May 22, 2018). A docket entry for May 22, 2018 states, in part:

> OFFICE CONFERENCE PROCEEDING HELD BEFORE PRESIDENT JUDGE JURDEN. THE STATE IS TO MEET WITH EACH DEFENSE COUNSEL AND GO OVER WHAT SPECIFIC EVIDENCE IS GOING TO BE USED FOR WHICH EACH OF THEIR CASE, SUCH AS CELL PHONE EVIDENCE AND GANG PARTICIPATION EVIDENCE.

*Id*. at A7.

[33] *Id*. at A97 (May 15, 2019 Discovery Letter).

[34] *Id*. at A103 (Motion *in Limine* to Exclude Certain Evidence).

does not dispute this.[35]   During an evidence review meeting on June 13, 2019, the State identified the full slate of Incriminating Messages.[36]  Wharton promptly moved to exclude them all.[37]

### III.    The Motion and Ruling Below

In his motion to suppress, Wharton acknowledged that "no formal Court ruling was ever made" in response to his May 18, 2018 request.[38]  In his motion, Wharton complained that "[o]n June 5, 2019, the State forwarded by email and brought to the attention of defense counsel a portion of a phone dump that was sent to defense counsel on January 14, 2018," and that "[t]he phone dump came from Isaiah Baird's cell phone and was dated March 29, 2017, the day after the homicide in this case."[39]  He further complained of the second production at the evidence review meeting just over a week later.[40]  Both productions "included statements made by the defendant damaging to his case and potentially impacting on the defense trial strategy."[41]  He also complained that the late revelation was

---

[35] *Id.* at A114 (State's Response to Motion *in Limine*).  *See* Oral Argument video at 10:57 – 11:05 https://livestream.com/accounts/5969852/events/9376916/videos/212923491/player:

> Traynor, J.: "Are you contending that the prosecution acted in bad faith?
> Defense Counsel: "No, I don't believe that there is a showing of bad faith."

[36] *Id.* at A115 (State's Response to Motion *in Limine*).

[37] *Id.* at A104 (Motion *in Limine* to Exclude Certain Evidence).

[38] *Id.* at A102.

[39] *Id.* at A103.

[40] *Id.*

[41] *Id.*

"at a time when the defense cannot really do much with it,"[42] and he argued that, had he been aware of the messages, he could have retained "a social media expert to explain the behavior of individuals utilizing social media and how they oftentimes embellish information or even make false posts given the nature of the media."[43] He also challenged the relevance of the Incriminating Messages, arguing that they could have been talking about a homicide other than the Powell homicide.[44]

At the hearing, the State represented that its statement in the May 15, 2019 letter that "cellular extraction of *Defendants'* phones will not be used" had a misplaced apostrophe, and because the State had intended to refer to *Defendant's* phones, it never intended to disavow use of Baird's phone extraction in Wharton's trial.[45] The State argued that irrespective of that typographical error, there was no basis to exclude the Incriminating Messages. Nevertheless, the State agreed that a continuance might be appropriate.[46]

The trial court delayed the start of trial to the following day to give Wharton's counsel time to interview Ervin and Aubrey.[47] In the trial court's view, those interviews

---

[42] *Id*. at A103–04.

[43] *Id*. at A104.

[44] *Id*.

[45] *Id*. at A143 (Motion *in Limine* Hearing).

[46] *See id*. at A144 ("if the defense needs more time then they need more time.").

[47] *Id*. at A148.

9

would cure any prejudice.[48]  Wharton's counsel interviewed both Ervin and Aubrey that same day.[49]

Wharton waived his right to a jury with the consent of the State.[50]  The Superior Court held a bench trial from June 19, 2019 to June 24, 2019.[51]  The following day, June 25, 2019, the trial judge issued the verdict, finding Wharton guilty of Murder in the First Degree, Possession of a Firearm During the Commission of a Felony, Conspiracy First Degree, Possession of a Firearm By a Prohibited Juvenile, and Carrying a Concealed Deadly Weapon.[52]  On December 5, 2019, the trial judge sentenced Wharton to twenty-nine years of unsuspended Level V time, followed by decreasing levels of supervision.[53]

### IV.    Issue Raised on Appeal and Contentions of the Parties

Wharton raises only a single issue on appeal, namely, that the Superior Court abused its discretion by denying his Motion to Exclude the Incriminating Messages.  He asserts that the evidentiary ruling was flawed in two respects.  First, he argues that the State's belated identification of the Incriminating Messages was contrary to the Superior Court's instructions given in response to his May 18, 2018 request for specific identification.  Second, he contends that the Superior Court should have held the State to its statement in

---

[48] *Id.*

[49] *Id.* at A150 (Trial Transcript).

[50] *Id.* at A127–30 (Jury Waiver Colloquy).

[51] *Id.* at A150–295 (Trial Transcript).

[52] *Id.* at A297–98 (Verdict).

[53] Op. Br. Ex. (Sentencing Order); *see also* App. to Op. Br. at A325–29 (Bench Ruling at Sentencing Hearing).  The State later entered a *nolle prosequi* on a Gang Participation charge which had been severed.

the May 15, 2019 letter that it would not use cell phone extractions at trial. He asks this Court to reverse the Superior Court's evidentiary ruling and to grant a new trial.

Wharton argues that he detrimentally relied on the State's affirmative statement that it would not be using "Information obtained from the cellular extraction of Defendants' phones" and that by permitting the State to introduce those messages, "the Superior Court rewarded the State" for its error.[54] Wharton believes that the State should be bound by its prior discovery responses because "the State must bear responsibility for its material misrepresentation."[55] While acknowledging that Superior Court Rule 16 does not impose on the State a requirement to identify the relevant cell phone evidence, Wharton argues that, because the State agreed to assume that task, it should be sanctioned for any oversights in its execution.

The State argues that because it provided the cell phone extractions to Wharton eighteen months prior to trial, no discovery violation occurred. The State argues that in granting Wharton time to interview the relevant witnesses, the Superior Court fully cured any prejudice.

## V. Analysis

"When we review an alleged discovery violation, we must first determine whether a violation occurred."[56] "If we conclude that a discovery violation occurred, then we apply

---

[54] Op. Br. at 15.

[55] *Id*. at 16.

[56] *Valentin v. State*, 74 A.3d 645, 648–49 (Del. 2013) (stating also that, "[w]e review a trial judge's interpretation of the Superior Court Rules of Criminal Procedure relating to discovery *de novo*, and we review the trial judge's application of those Rules under an abuse of discretion standard.").

11

a three-factor test that considers '(1) the centrality of the error to the case; (2) the closeness of the case; and (3) the steps taken to mitigate the results of the error.'"[57]  We will reverse a conviction on the basis of a discovery violation only if the defendant's substantial rights are prejudicially affected.[58]  Where there has been no discovery violation, however, the Court need not engage in that three-part analysis.[59]

Wharton concedes that the State did not violate Superior Court Criminal Rule 16.[60] He received the cellular phone data, which included the Incriminating Messages, promptly and early in the discovery process.  Instead, he asserts that the State violated either the trial court's statements at the May 22, 2018 office conference instructing the State to identify the relevant cellular phone material, or the State's own representation in its May 15, 2019 letter denying that it would use material from *Defendants'* cellular phones.

### A.  The State Did Not Violate the Trial Court's May 22, 2018 Instructions

The State made clear at the May 22, 2018 office conference that it could not be certain what material from the cellular phone extractions would be relevant at trial.[61]  The

---

[57] *Id.* (quoting *Oliver v. State*, 60 A.3d 1093, 1096–97 (Del. 2013)).

[58] *Id.*

[59] *Wright v. State*, 25 A.3d 747, 753 (Del. 2011).

[60] *See* Oral Argument video at 4:40 – 5:03 https://livestream.com/accounts/5969852/events/9376916/videos/212923491/player:

> Traynor, J: [Defense Counsel], do you contend that under the rules the State has the obligation to identify the evidence that it intends to introduce at trial?
>
> Defense Counsel: Strictly under Rule 16, no, they are not obligated to specifically identify which portions of the evidence they intend to introduce, but in this case the State undertook that obligation voluntarily.

[61] App. to Op. Br. at A57 (Rule 16(a)(C) Office Conference).

State also stated that if it discovered anything new in those extractions, or if it learned of any other information that changed the apparent meaning of those extractions in a manner making them relevant, whether that relevance was favorable or unfavorable to the State, it would immediately alert Wharton and his codefendants.[62] The State thus placed Wharton on notice at the office conference that its continued review of that information might cause it to reevaluate the relevance of the already-conveyed discovery. Further, the State made clear that its over-inclusive production of materials recognized that Wharton and his codefendants might regard something as helpful which the State had not considered, or which the State had not yet noticed or found.[63] Wharton acknowledges that the State notified him immediately when it identified the Incriminating Messages.

The State also told the trial court that it had several conversations with Wharton's counsel and explained that it would not use material from Wharton's phone because it "did not want to fight the validity of these search warrants."[64] But, according to the State, it advised Wharton's counsel that "the same evidence can be found on the other social-media mediums or cellphone extractions,"[65] and that this "was made crystal clear."[66]

Wharton asserts that it is "inexplicable" that the State would start to identify portions of the discovery which it intended to use before it had fully combed through all of the

---

[62] *Id*. at A57–58.

[63] *See id.* at A81 ("I haven't reviewed every page of the 10,000 pages of every cell phone document. There could be something that the defense loves in those cell phones.")

[64] App. to Op. Br. at A143 (Trial Transcript).

[65] *Id*.

[66] *Id*.

13

digital information in its possession.[67]  But Wharton's counsel also had an independent obligation to review the discovery material.  In addition, we note that several of the key texts were dated the day after the Powell homicide which would have been a logical timeframe to explore in reviewing the material.  The State represented during the trial that it went to Wharton's counsel's office after hours and showed her "how to use the most recent cellular extraction software, how to find stuff, how to filter stuff."[68]  At oral argument before this Court, the State reiterated that the database it provided was "entirely searchable."[69]

Moreover, Wharton was in a *better* position than the State to find the Incriminating Messages.  He is the one who sent them.  Thus, Wharton had to know about their contents.  Wharton was necessarily aware that he was at the risk of the State learning of those

---

[67] Op. Br. at 14.

[68] App. to Op. Br. at A143 (Trial Transcript).

[69] At oral argument before this Court, the State represented that:

> Mr. Vella:  We've heard a lot about these 14,000 pages and if printed out, I'm sure it is 14,000 pages.  What the prosecutor did in this case, as the State does in many cases, is the prosecutor took these flash drives to defense counsel, uploaded the software that our people use to review these things.  It's a searchable, it essentially makes the downloads or the extractions searchable by any number of parameters, including the date.  And granted there may be a lot of information in a particular date, but these are entirely searchable digital documents, and we provide defense counsel with the software to use that we would also use.  So, I just don't want the Court to come away with the feeling that or the sense that there's just a stack of documents to the ceiling that defense counsel or the State is going through.  It's a digital document that is searchable and there are parameters including the date.

Oral argument video at 20:47 – 22:01 https://livestream.com/delawaresupremecourt/events/9376916/videos/212923491/player.

conversations, whether through some digital record or from Baird himself. Thus, the State could not have "lulled him into a false sense of complacency."[70]

In his opening brief, Wharton cites *Johnson v. State*[71] and *Valentin v. State*,[72] in support of his position that he is entitled to a new trial with the Incriminating Messages excluded. Both cases involved the State failing to convey material to the defendant in response to valid discovery requests until the trial was underway or completed.[73] Even in those cases, the remedy this Court granted was a new trial with the withheld evidence properly conveyed.[74] In neither case did the State, as it did here, produce the evidence to the defense prior to the trial. Neither case supports the remedy Wharton seeks here, namely, an order for retrial with the evidence excluded.[75]

---

[70] Op. Br. at 15.

[71] 550 A.2d 903 (Del. 1988).

[72] 74 A.3d 645 (Del. 2013).

[73] In *Johnson*, the State withheld the existence of a police officer's handwritten notes regarding the content of the defendant's oral statement until calling the officer as a rebuttal witness to contradict the defendant's testimony. 550 A.2d at 909–10. In *Valentin*, the State failed to convey a dispatch recording of a police pursuit that supported the defendant's version of events and contradicted key prosecution witnesses. 74 A.3d at 650–52.

[74] *Valentin*, 74 A.3d at 652; *Johnson*, 550 A.2d at 914. In *Johnson*, we further precluded the State from using portions of the defendant's first trial testimony about his oral statement against him on retrial, effectively placing him in the position he would have been in had the evidence been properly disclosed. *Id.*

[75] In his reply brief, Wharton proffers three additional cases, *Oliver v. State*, 60 A.3d 1093 (Del. 2013), *Doran v. State*, 606 A.2d 743 (Del. 1992), and *Ray v. State*, 587 A.2d 439 (Del. 1991). Of these, only *Doran* involved an exclusionary remedy. In that case, a police officer claimed that the defendant made an oral statement to him which the State failed to disclose in discovery. 606 A.2d at 744. A new prosecutor took over the case, re-interviewed the officer, and upon learning of the officer's asserted knowledge of the statement immediately disclosed it to the defendant on the eve of trial. *Id.* The trial court excluded the statement in the State's case-in-chief. *Id.* But when the defendant testified, the Court granted the State's request to use the defendant's prior oral statement for purposes of impeachment, permitting the State to cross-examine him about the statement and

15

Based upon our review of the record, we reject Wharton's claim of error that the State violated the trial court's instructions.

B. *The Superior Court's Did Not Otherwise Abuse Its Discretion*

We next address Wharton's assertion that the Superior Court erred in not excluding the Incriminating Messages because it should have held the State to its statement in the May 15, 2019 letter that it would not use the *defendants'* cell phone extractions. We first consider whether the State committed a discovery violation based on the circumstances surrounding this letter.

At the time it sent the letter, the State had not yet discovered the Incriminating Messages. The State's prompt action upon discovery suggests no bad faith or misconduct. The trial court carefully considered Wharton's assertions of prejudice and the circumstances surrounding the State's mistaken use of a plural-possessive in the letter. The Superior Court accepted that the misplaced apostrophe was an innocent typographical error and did not constitute a discovery violation.[76] For context, in reaching this conclusion the trial court noted the "amazing amount of cooperation between the State and the defendant and the voluminous amount of discovery."[77] The trial court also noted that the State had

---

then recall the officer to testify about the statement in rebuttal. *Id*. at 745. We affirmed the trial court's rulings as "entirely correct." *Id*. at 747-48. *Doran* is inapposite to the present circumstances. Here, the Incriminating Messages were recorded in a digital format which the State promptly conveyed more than a year earlier, and as soon as any agent of the State had actual knowledge of the Incriminating Messages immediately disclosed them to Wharton.

[76] *See* App. to Op. Br. at A147 (Trial Transcript) ("I understand and I believe completely [the prosecutor's] representation that the apostrophe on defendants should have been before the S, not after, and I believe your explanation as to the intent of the State's letter of May 15.").

[77] *Id.*

16

produced discovery that it did not have an obligation to produce to avoid trial by surprise, and that it "applaud[ed] the State's efforts in that regard."[78]

Nevertheless, at the hearing on the motion to exclude, the Superior Court ordered time and opportunity for Wharton to conduct two interviews. Wharton did conduct those interviews, but apparently nothing came of them.[79] Although the typo was an unfortunate unintentional mistake, like the Superior Court, we do not believe the State violated its discovery obligations.

But, even if we were to assume *arguendo* that the State's May 15, 2019 letter gave rise to a technical discovery violation, we are convinced that the Superior Court addressed any prejudice suffered by Wharton, and that it did not abuse discretion by granting Wharton some additional time to conduct the two interviews and denying his request to exclude the Incriminating Messages.

An application of the three-factor test to this assumed technical violation further supports this conclusion. As to the centrality of the alleged technical violation (which is merely assumed *arguendo*), this factor favors Wharton as the Incriminating Messages are exactly that -- highly incriminating. Both sides agreed they are highly relevant. They amount to a virtual confession from Wharton that he pulled the trigger to take Powell's life.[80]

---

[78] *Id.*

[79] *Id*. at A150.

[80] In his opening brief, Wharton states that the contents of his co-defendant's cell phone extraction "amounted to a confession by Mr. Wharton." Op. Br. at 3.

However, as to the closeness of the case, this case was not close in our view. Security camera footage showed Powell being followed for approximately eleven blocks and then slain by two individuals. In electronic messages, the victim himself specifically identified those individuals as Wharton and Smith. The footage does not make clear who fired the fatal shot, and so absent the Incriminating Messages, the State needed to rely on Smith's testimony and on circumstantial evidence to establish Wharton as the shooter. Although the State concedes that, without the Incriminating Messages, distinguishing whether Wharton was the shooter or the shooter's companion was a 'fairly close' question,[81] Delaware law recognizes that Wharton and Smith were both culpable because they were charged as co-conspirators. Although the State's main theory was that Wharton was the shooter, there was ample evidence supporting the conspiracy theory.[82] Thus, even without the Incriminating Messages, proof of Wharton's guilt was overwhelming.

The third factor, the steps taken to mitigate prejudice, also does not favor Wharton. The Superior Court carefully weighed the circumstances and remediated any injury to Wharton caused by the errant apostrophe. It found the sensible solution to be "to allow the defense time to speak with Aubrey and Twin if they think it's necessary, which they have told the Court they do, and that will cure the prejudice they articulated today in Court."[83] As for Wharton's assertion that he might have retained a social media expert, the court

---

[81] Ans. Br. at 17.

[82] *See* App. to Op. Br. at A326–27 (Sentencing Hearing and Bench Ruling).

[83] *Id.*

18

aptly noted that "this is not a social-media issue."[84]  Rather, "[t]his is a text conversation via cellphone."[85]  Thus, the trial court did not "find much prejudice," and did not "find overwhelming prejudice or substantial prejudice sufficient to exclude the evidence."[86] Further, Wharton could only have relied on the May 19, 2019 letter for the three weeks after it was sent.  Wharton could have asked for a continuance but he never did.  His failure to do so seriously undercuts his argument for exclusion.[87]  In sum, we find no merit to Wharton's assertions that the Superior Court abused its discretion in determining that exclusion of the Incriminating Messages was unwarranted.

## VI. Conclusion

For the forgoing reasons, the Superior Court's discovery rulings and its subsequent verdict and judgment of sentence are therefore AFFIRMED.

---

[84] App. to Op. Br. at A148 (Trial Transcript).

[85] *Id*.

[86] *Id*.

[87] *See, e.g. Taylor v. State*, 982 A.2d 279 (Del. 2008).  In *Taylor*, a rape victim turned over a second journal that contained corroborating facts on the eve of trial.  The State informed the defense about the journal at the pre-trial conference.  The defense moved for a continuance.  The trial judge postponed the State's case-in-chief until the next morning and the parties proceeded with jury selection and opening statements that day.  The following morning, the defense moved to suppress the journal but did not renew the motion for a continuance.  In affirming, we found that the only claim of colorable prejudice was defense's lost time to prepare for cross-examination.  We ruled that the several hours Taylor had was sufficient time to determine whether a continuance was needed in order conduct further trial preparation.  We stated, "[b]ut Taylor did not renew his motion for a continuance the next day, nor did he point to specific portions of the diary that should be excluded."  *Id*. at 284.  Accordingly, we held that, "[g]iven the lack of factual support for any claimed discovery violation, the Superior Court did not abuse its discretion in denying Taylor's motion to suppress."  *Id*.

19